In the Matter of Aaron E. Koota, as District Attorney of Kings County, Petitioner, *v.* Salvatore Bonanno, Respondent. (And 12 Other Proceedings.)

Supreme Court, Criminal Term, Kings County, July 7, 1966.

*Aaron E. Koota, District Attorney* (*Elliot Golden* and *Irving P. Seidman* of counsel), for petitioner. *A. J. Kreiger* for John Morale and another, respondents. *Robert Kasanof* for Frank La Bruzzo and another, respondents. *Ernest H. Rosenberger* for Rosario Morale, respondent. *William Sonenshine* for Nicholas Managello and others, respondents. *Joseph A. Darienzo* for John Fiordilino, respondent. *Marvyn M. Kornberg* for Sereno Tartamella, respondent. *Anthony F. Marra* and *Gerard B. Betts* for Frank Bonanno, respondent.

J. IRWIN SHAPIRO, J. Thirteen separate applications to punish for contempt are here involved. They will be discussed jointly in this opinion but separate orders will be entered in each case. The District Attorney of Kings County has applied for an order adjudging each named witness guilty of criminal contempt of court because of his refusal to testify before the Kings County Grand Jury which then was and still is conducting an investiga-

tion to determine whether a number of individuals, prior and up to January 28, 1966, combined in the formation and partial execution of a conspiracy to commit assault, murder and other vicious crimes within the county.

The District Attorney at first applied orally for such orders in the presence of the witnesses, some of whom were then represented by counsel. I informed the District Attorney that if he desired to move to punish the witnesses for contempt, he would be required to serve orders to show cause upon them based upon an affidavit setting forth the acts of criminal contempt claimed to have been committed by each witness. I further directed that there be attached to each order to show cause a copy of the minutes of the Grand Jury proceedings affecting and involving the particular witness.

Such orders to show cause were served and the applications thereafter came on for hearing before me. It appeared that the District Attorney misunderstood the court's direction with respect to annexing copies of the minutes of the Grand Jury proceedings to each order to show cause and instead in his supporting affidavit paraphrased what transpired with respect to each witness before the Grand Jury. I then directed that each witness be forthwith given a copy of the proceedings before the Grand Jury affecting him and when that was done a recess was declared so that each witness and his counsel could examine the transcripts. After that had been done the hearing proceeded and I directed that the transcripts be deemed a part of the motion papers in each case.

Except for a complete set of the Grand Jury minutes which the District Attorney delivered to the court (and the transcripts incorporated in the moving papers) no evidence was offered or taken so that the hearing then afforded the witnesses (all of whom were present in person) was limited by their counsel to a controversy over issues of law.

The Grand Jury minutes reveal that each witness asserted a claim of Federal privilege against self incrimination although each was duly granted immunity by the Grand Jury under the authority of section 2447 of the Penal Law.

The basic question here is whether the susceptibility of the respective witnesses to possible Federal prosecution for crimes disclosed by their testimony justified their refusal to answer the questions put to them before the Grand Jury. At a conference between the court and counsel it was agreed that since the controlling issue raised in opposition to the District Attorney's application was that the witnesses could not be compelled to testify before the Grand Jury because State immunity was

not broad enough to protect them from Federal prosecution, that the court need not go through the futile formality of directing each witness to answer the questions propounded at the Grand Jury session and asking, in each case, whether he would do so since their respective counsel had informed the court that the answer would be in the negative.

In short the stipulation was that although there had been no actual direction by the court and refusal by the witnesses the proceedings should follow as if there had been such direction and refusal and that the court's omission to give such a direction and evoke such a refusal would not, in the event of appeal, be raised as a defect in these proceedings.

It was further agreed that the court would put the matter over for further consideration, would receive memoranda from both sides in the meantime, and that if the court should decide to grant the District Attorney's motion to find each witness guilty of contempt the court would in its opinion, in accordance with counsel's representation to that effect, proceed upon the assumption that each witness would refuse (any further direction by the court) to go before the Grand Jury and answer the questions that had been propounded to him.

On the occasion of this hearing, three witnesses were unrepresented by counsel. Two had retained attorneys who had not appeared and the third informed the court that he could not afford to retain counsel. At his request for the assignment of counsel, I appointed the Legal Aid Society to represent him and had the court Clerk conduct him to its office and acquaint their representative of the nature of the proceeding and to inform him that the matter would be continued the following day. It was also requested to consult with the witness in the meantime. The other two witnesses were instructed to be present, with their counsel, the following morning. All three witnesses, with their counsel, appeared as directed and the hearing was resumed. Prior to the resumption of the hearing the court informed the attorneys of the result of the conference held the day before and of the stipulation then entered into and they then joined in the agreement theretofore reached by the court with the other counsel. The attorneys were then heard on their contentions.

Some of the attorneys contended that the procedure followed by the District Attorney, and as permitted by the court, was fatally defective by reason of the court's refusal to accede to their request that the District Attorney be compelled to furnish them with a *complete* transcript of the proceedings before the Grand Jury, not only as it affected their particular witness, but

all of the witnesses heard before the Grand Jury, or in the alternative that the District Attorney be required to come forward with evidence establishing the relevancy of the questions to the subject matter of the investigation and the materiality of the witness himself to those questions.

Their position is tantamount to an assertion that a witness ought not to be punished for contempt without a showing, in some way, that he was so connected with the persons or events under investigation as to justify an inference that he has some knowledge of or information about them that would advance the purposes of the inquiry. I will deal with that contention hereafter but I make mention of its occurrence at this point because it completes the summary of the procedural aspects of the case and permits a consideration of the facts, as represented to the court by the District Attorney, and as derived from an examination of the Grand Jury minutes.

On or about January 28, 1966 there was a considerable volume of gun-fire in the vicinity of 283 Troutman Street, Brooklyn, Kings County, New York. At the scene of the occurrence, members of the New York City Police Department gathered up some seven fire-arms and many expended shells. In the course of an investigation into the shootings the Police Department and the District Attorney's office became convinced from evidence obtained by them that the incident was an overt act by one group of gangsters who were waging a contest with another group for the leadership of an organization engaged in Kings County in such criminal activities as gambling, illicit dealings in narcotics, usury and other crimes.

Those who are combined in this multi-faceted criminal enterprise are described as a "family" which is named after its leader, Joseph Bonanno. Hence, members of the "Bonanno family" are simply members of the criminal organization although they may, or may not be, related to the leader by blood or affinity. There are, also, lesser associates, who have not attained "family" status but who aid in the conduct of its business in one way or another. It is in one or more of the ways just described that the witnesses now before the court are said to have been connected with the "Bonanno family" prior to and at the time of the shooting incident investigated by the police and the District Attorney.

Upon concluding his preliminary investigation the District Attorney brought the matter before the Regular January 1966 Grand Jury which began an inquiry into the affair. Its purpose was to determine whether, within its jurisdiction, persons then unknown had hatched a conspiracy to commit murder, assault,

and other crimes in the course of a struggle for succession to the leadership — actually or ostensibly relinquished by Joseph Bonanno — of the "Bonanno family".

Each of the witnesses now before the court appeared before the Grand Jury twice. On the occasion of his first appearance he was sworn and informed of the purpose of the investigation, of his privilege against self incrimination, of the possibility and potential of an immunity-grant and of his right to counsel and he was then excused until a future date. When recalled he was reminded, in detail, of the instruction given him on his earlier appearance and he was then questioned by the District Attorney. While there were, naturally, minor variances in factual details, the refusals to answer occurred in much the same way.

Each witness was asked and then refused to answer each of a series of questions on the ground that the answer would involve self incrimination, in violation of the rights secured by the Federal and State Constitutions. At the end of this series of refusals the District Attorney asked and recommended that the Grand Jury grant the witness (still on the stand) immunity pursuant to the provisions of section 2447 of the Penal Law and then the District Attorney's representatives, the witness and the stenographer left the room so that the panel might consider and act upon the request in privacy. Although the record does not disclose how the Grand Jurors signified that they had reached a decision, it appears that the District Attorney's representatives, the stenographer and, on some occasions the witness as well, were re-admitted to the Grand Jury room and informed that the immunity had been granted. On other occasions the District Attorney was informed of the grant and the witness was then recalled and likewise informed. On all occasions the witness was informed of his consequent immunity from prosecution and his liability to prosecution for contempt or perjury, if warranted, and the questions, at which the witness had previously balked, were repeated. In each instance the witness again invoked his constitutional privilege against self incrimination and declined to answer. At the request of the District Attorney, the Grand Jury Foreman directed him to answer and the witness repeated his refusal. Although not the same in all cases, typical questions were:

"Do you know Salvatore Bill Bonanno?"

"Do you know Joseph Bonanno?"

"Are you a member of, associated with, or aware of a group of individuals known as the Bonanno family, or the Bonanno gang or clan?"

"Do you know a man by the name of Gaspare Di Gregorio?

"Has Gaspare Di Gregorio replaced Joseph Bonanno as head or boss of the Bonanno family?

"Did you see Salvatore Bill Bonanno drive or in a 1964 white Lincoln automobile in the vicinity of Troutman Street and Knickerbocker Avenue, Brooklyn, on the evening of January 28th, 1966?

"Were you, or was anybody else known to you in the vicinity of Troutman Street, and Knickerbocker Avenue, Brooklyn, on the evening of January 28th, 1966?

"I show you these guns, presently arrayed before you (there were seven) and I ask you, whether you have ever seen any of them prior to appearing before this grand jury?"

In this setting, the issue of law—whether the breadth and scope of the immunity granted fails to meet Federal standards—is resolved adversely to the witnesses. The decision is controlled by what I consider to be a correct concept of Federal standards and I reject the claim advanced on behalf of each witness—that unless he obtains "transactional" immunity *from Federal prosecution* the protective scope of the Fifth and Fourteenth Amendments justifies his refusal to answer.

The "transactional" immunity contention is necessarily founded upon a blending and equating of the New York State statute governing "immunity" with the "privilege" provisions of the Fifth Amendment to the United States Constitution without any attempt however to distinguish their basic differences. By section 2447 (subd. 2) of the Penal Law a witness is immune from State prosecution or subjection to penalty or forfeiture "for or on account of any *transaction, matter or thing concerning which,* in accordance with the order by competent authority [in this case, the Grand Jury], *he gave answer or produced evidence*". (Italics supplied.) Since such State immunity encompasses "transaction, matter or thing" concerning which inquiry is made of the witness the contention advanced in this case is that the witness must be given like "transactional" immunity from any action by Federal authorities lacking which he may not be compelled to answer. The contention is ill founded. Immunity is a statutory creation. What the Fifth Amendment grants is not immunity but a constitutional "privilege" against self incrimination.

I hold as a matter of law that the immunity conferred by the Grand Jury is *not* broad enough to give the witness the Federal transactional immunity claimed—nor need it constitutionally be. *If Federal standards of Fifth Amendment gave State immunity statutes such a reach a witness would not be prosecut-*

*able under Federal law even though the Federal Government had entirely independent evidence upon which it could proceed against him without recourse to his testimony simply because the witness had given evidence or made answer under oath concerning the transactions, matters or things in question.*

An analysis of fundamentals may serve to dissipate some of the doubt that counsel profess to see in the situation under review. The provisions of the Fifth Amendment were first brought to bear against the several States, through the Fourteenth Amendment, by the decision of the United States Supreme Court in *Malloy* v. *Hogan* (378 U. S. 1). After holding " that the Fifth Amendment's exception from compulsory ·self-incrimination is also protected by the Fourteenth Amendment against abridgement by the States " (378 U. S. 6) the court proceeded to impose the Federal " privilege " standards upon the several States, saying: " It would be incongruous to have different standards determine the validity of a claim of privilege based on the same feared prosecution, depending on whether the claim was asserted in a state or federal court. Therefore, the same standards must determine whether an accused's silence in either a federal or state proceeding is justified." (378 U. S. 11.) It then reiterated " the content of the federal standard " as laid down in its earlier opinion in *Hoffman* v. *United States* (341 U. S. 479, 486–487) that " ' The privilege afforded not only extends to answers that would in themselves support a conviction * * * but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute ' ". (378 U. S. 11.)

Prior to its decision in *Murphy* v. *Waterfront Comm.* (378 U. S. 52), which was decided the same day as the *Malloy-Hogan* case (*supra*) " co-operative federalism " had not reached the point where a State grant of immunity had been dignified with respect by Federal authority (*Knapp* v. *Schweitzer,* 357 U. S. 371) so that the constitutional privilege against self incrimination did not protect the witness in one jurisdiction from being compelled to give testimony which could be used to convict him in another jurisdiction. It was in the *Murphy-Waterfront* case that the highest tribunal of the United States made its only recent concession to the several States, comprising these United States, by reversing the position that it had taken in *Knapp* v. *Schweitzer* (357 U. S. 381) and newly determined " that the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law." (378 U. S. 77–78.) In deciding what

effect the court's holding had on existing State immunity legislation (in terms of the Federal standards mandated by its opinion in the *Malloy* case), the court said: "we hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law *unless the compelled testimony and its fruits cannot be used* in any manner by *federal officials in connection with a criminal prosecution against him.* We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits." (378 U. S. 79, emphasis supplied.)

It is at this point in its opinion that the court in a footnote (No. 18) gave notice to the Federal law-enforcement officials that, "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence."

Mr. Justice WHITE (Mr. Justice STEWART, concurring) was more specific. He said: "*The Constitution does not require that immunity go so far as to protect against all prosecutions to which the testimony relates,* including prosecutions of another government, whether or not there is any causal connection between the disclosure and the prosecution or evidence offered at trial. In my view it is possible for a federal prosecution to be based on untainted evidence after a grant of federal immunity * * *. *Likewise it is possible that information gathered by a state government * * * will not in any manner be used in subsequent federal proceedings*". (378 U. S. 106, emphasis supplied.)

Were there any remaining substantial doubt about the impact of "footnote 18" it must evaporate in the light of another footnote comment by Mr. Justice HARLAN (Mr. Justice CLARK, concurring) in which he said: "As I understand the rule announced today, albeit resting on premises which I think are unsound, it is a prohibition against *the use of state-compelled incriminating evidence or the 'fruits' directly attributable thereto in a federal prosecution.*" (378 U. S. 91, n. 7, emphasis in original.)

It is apparent that what the court was discussing was the privilege—the right—not to have a witness charged with crime in either a Federal or State jurisdiction on the basis of an answer he was compelled to give in either jurisdiction or, from using any leads developed as the result of such a compelled

answer, and that both the majority and concurring opinions are not only instinct with the proposition but affirmatively assert that the compulsory giving of such testimony by a witness does not constitutionally require that the Federal authorities be precluded from prosecuting on transactions, things or matters to which the compelled answer relates provided only that the prosecution is based wholly and completely upon evidence derived from " an independent, legitimate source ".

Counsel's reliance upon the recent case of *Albertson* v. *Subversive Activities Control Bd.* (382 U. S. 70) is misplaced. The court there simply decided that the immunity provisions of the Federal statute there in question were not as broad as the constitutional privilege, in that " It does not preclude any use of the information called for by [the form] either as evidence or as an investigatory lead " (382 U. S. 80) and dealing with specific reference to the demand for the individual's admission to Communist party membership, the court said " It does not preclude the use of the admission as an investigatory lead, a use which is barred by the privilege ". (382 U. S. 80.) In other words the Federal statute under consideration in that case did not preclude the use of the testimony, or any lead from the testimony given by the witness, and it was for that reason that it was held that the statute was violative of the witness' rights under the United States Constitution. The court did not there in any way hold, or even intimate, that if the statute under review precluded the use of the testimony of the witness or any leads emanating therefrom, that the witness could *not* be indicted for a crime to which the testimony related provided the prosecution was not tainted by having its genesis in the witness' own testimony.

To summarize : *Malloy* v. *Hogan* (*supra*) invoked the Fifth Amendment against the States (via the Fourteenth Amendment) and imposed Federal standards determinative of its scope; *Murphy* v. *Waterfront Comm.* (*supra*) proclaimed an act of comity and specified the *quid pro quo* exacted in return, i.e., a recognition by the United States Supreme Court of the State's authority to grant *testimonial immunity* binding upon Federal law enforcement officials, and in return binding State officials by a like Federal grant, and, in both cases, delineating the security of the witness as coextensive with his Fifth Amendment " privilege " under Federal standards which forbids only the use of testimony furnished under compulsion (or leads therefrom) but does not grant the witness immunity against his indictment in connection with the transaction, matter or thing inquired about provided only that the indictment or charge " had an independ-

ent legitimate source ", and *Albertson (supra)* merely struck down a particular statute which did not meet the Federal standards set forth in *Malloy* and *Murphy.*

While " ' legislation cannot abridge a constitutional privilege ' " (*Murphy* v. *Waterfront Comm., supra,* p. 78, quoting from *Counselman* v. *Hitchcock,* 142 U. S. 547, 560) it may enlarge the privilege as, on its face, the New York statute assumes to do (Penal Law, § 2447, subd. 2). The so-called " transactional " immunity thus statutorily conferred is given full effect by the New York courts (see, e.g., *Matter of Grand Jury [Cioffi],* 8 N Y 2d 220, 224, 226) but the opinions written and the footnote remarks made in the *Murphy* case (*supra*) leave no doubt that the United States Supreme Court has declined to deem the individual's Fifth Amendment privilege against self incrimination to be as broad as the " transactional " immunity conferred by the New York statute. The refusal of each witness in these proceedings to answer was not, therefore, justified by his invocation of the Fifth Amendment.

The witnesses here do not argue that they were not adequately informed that they were being granted complete immunity under New York law and, actually, such a claim would have no valid foundation for in their appearances before the Grand Jury the witnesses were clearly and forcefully informed that the immunity, forecast on the first appearance and conferred during the second, was full and complete (*Matter of Grand Jury [Cioffi],* 8 N Y 2d 220, 225, *supra*). The District Attorney's assistants were not obliged to debate the extent of Federal immunity coverage with the witnesses since the latter followed as a matter of course by operation of law and, of course, it was completely beyond the competence of the local District Attorney to confer any greater Federal immunity.

As noted earlier, counsel for some of the witnesses contended that their connection with the subject matter of the investigation—and hence the relevancy of their testimony—had not been established by the District Attorney and that, in the absence of such a showing, the witnesses should not be adjudged in contempt. They contended that they were entitled to a full set of the minutes and to a hearing so that the connection of the witnesses and the materiality of their testimony could be determined. Underlying this contention is counsel's apprehension that the District Attorney, motivated by a desire to penalize a particular individual, but having no evidence upon which he could obtain a conviction, might bring the individual before a Grand Jury, knowing that he would refuse to answer and thus achieve his unworthy purpose by maneuvering the witness into

refusal and subjection to punishment for contempt. To balance the legitimate interests involved (counsel contends) the witness should not be punished unless it is *first* shown that he was connected, somehow, with the persons and events involved and that his testimony is relevant. Here, as in *Matter of Koota* v. *Colombo* (17 N Y 2d 147, 151), the witnesses offered no evidence to support the suggestion that the District Attorney was acting in bad faith. Apart from that, the court has been apprised of the relation of the witnesses and the relevancy of their testimony to the subject matter of the investigation in such fashion as to enable it to make an independent estimate of the relation of the one to the other (*Matter of Koota* v. *Colombo, supra*, p. 150). The court has examined the Grand Jury minutes, with due regard to the rights of both parties, and is satisfied that there is no basis for the apprehension expressed by counsel, since it is satisfied that the requisite connection has been established and that the evidence sought to be educed from these witnesses is relevant to the subject of the investigation. I decline, however, to direct that the District Attorney make these minutes available to the counsel for the witnesses and, to the contrary, direct that, except for those portions of the minutes heretofore furnished to counsel, the rest be sealed and that they be transmitted, in that condition, to the appellate court in the event of appeal from the adjudication now made.

All that now remains is to consider the "belief" of one of the counsel that the composition of this Grand Jury may have changed since it was empaneled and that "dropouts" may have been replaced illegally so that the panel may not be a legally constituted Grand Jury, or at least not entirely so. Without offering any evidence to counter the presumption of regularity, counsel would have the court conduct a hearing into that aspect of the matter and he coupled with the request for such a hearing a suggestion that the court direct that the relevant Grand Jury records be brought before it. I declined so to do, on argument, and I repeat my declination here. Aside from the fact that there is no apparent basis for the speculative possibilities conjured up by counsel no effort has been made to gain access to the Grand Jury records to either confirm or exclude the possibilities referred to (see *People* v. *Brinkman*, 126 N. Y. S. 2d 486).

Before handing down this opinion, and in spite of the stipulation of counsel making such procedure unnecessary, each witness (except Anthony Pressanzano who was in the hospital and whose case was therefore adjourned) was personally directed to forthwith appear before the Grand Jury and then and there

answer the questions theretofore propounded to him. Each witness (except for two, Frank Bonanno and John Fiordilino who complied) refused so to do. Each of such recalcitrant witnesses is, therefore, adjudged in criminal contempt of this court and each is hereby sentenced to the Civil Prison of the City of New York for a term of 30 days and in addition thereto is to pay a fine of $250, and in the event said fine is not paid he shall be imprisoned for an additional term of 30 days.

While I have held each offending witness to be guilty of a criminal contempt of court, out of a superabundance of caution, I direct the District Attorney to take appropriate steps to see that the 1966 Regular Grand Jury is continued in existence so that these proceedings may not become abortive if it is held that the contempt is a civil and not a criminal one (see *Shillitani* v. *United States,* 384 U. S. 364, decided June 6, 1966).