J. Irwin Shapiro, J.
This is a motion for “ an order directing the dismissal of the indictment herein upon the ground that the Grand Jury Avhich returned said indictment Avas unconstitutionally selected and therefore did not acquire jurisdiction to *712 charge the defendants above-named * * Before dealing with the merits it is necessary to point out some procedural defects in the making of the motion.
The legend “ indictment #1223-67 ” is indorsed on the back of the motion papers and on the face of the notice of motion. That indictment, however, does not list the persons above named as defendants. It names only Herman B. Ferguson and Arthur Harris as defendants and charges them with one crime, to wit: conspiracy to commit murder. However, the caption on the motion papers here names as defendants, in addition to Ferguson and Harris, the five other persons above named. The title on these motion papers is therefore clearly incorrect and is doubtless due to the fact that all seven defendants listed in these motion papers, together with 10 other defendants, are named as defendants in Indictment No. 1224-67 (which charges the defendants with conspiracy to commit criminal anarchy and which was handed down simultaneously with Indictment No. 1223-67). The moving defendants no doubt desire to have this one motion apply to both indictments. Therefore, despite the faulty procedure, the decision rendered on this motion will be considered to apply to both of said indictments.
Improper procedure was also followed in another respect in the making of this motion. Annexed to the notice of motion, and in sole support thereof, there is an affidavit by one of defendants’ attorneys in which the basis for the motion is contained in a short statement “ that the statutory method of selecting jurors in Queens County requires a subjective test by the jury selectors,” which thus “ allows maximum opportunity for favoritism and bias in the selection of jurors.” The affiant then goes on to promise that in a memorandum of law to be submitted he will indicate “ in detail why the Grand Jury which indicted these defendants was unconstitutionally selected.” A memorandum of law is unsworn and is not a filed paper. Consequently, assertions of fact contained therein, if any, may not be considered in the disposition of a motion. Parenthetically, the memorandum submitted is utterly devoid of any showing of fact tending to establish that the grand jurors who returned this indictment were “ unconstitutionally selected.”
I proceed now to consider the motion on the merits.
This motion to dismiss the indictments is bottomed upon the postulate that the Grand Jury which returned the indictments was unconstitutionally selected. As the predicate of this postulate, defendants contend that the provisions of the Judiciary Law dealing with the qualifications of grand jurors in New York City (§§ 596, 609, 662, 684, subd. 1) are unconstitutional *713 because the provisions therein that a juror to be qualified to serve must be intelligent, of sound mind and good character, well informed (§ 596) and a person who has not been convicted of a “misdemeanor involving moral turpitude” set up an impermissible subjective test for qualification of a juror to be applied by the Jury Clerk.
In support of this thesis, defendants rely upon the cases of Louisiana v. United States (380 U. S. 145) and Chestnut v. People of State of New York (370 F. 2d 1) with the strongly implied suggestion that the judgment of the Clerk in applying this allegedly “ subjective test ” would or might be influenced and colored by his bias and prejudices. In addition, and to bolster this contention and the implication intended for it, it is stated by defendants: ‘ ‘ The overriding preoccupation of the United States Supreme Court in our time is to strike down all remaining methods by which Afro-Americans have been relegated to second class citizenship, whether the method be simple or sophisticated. All the defendants herein are Negroes. It is a matter of common observation in Queens County that most Grand Juries consist solely of white people, and at best Negroes receive an occasional token representation on such bodies. Since the proportion of Negroes in the population of Queens County is at least one sixth that of the general population, it is impossible to believe that this lack of representation on the Grand Juries is fortuitous. Since the Grand Jury which indicted the defendants was selected under this statute, its indictment is invalid and must be dismissed.” And as to the test of having been convicted of a misdemeanor involving moral turpitude, defendants assert, to demonstrate how “ subjective ” such standard is, that “Negroes arrested for a demonstration to secure basic civil rights and convicted of misdemeanors in connection therewith might well, in the view of the County Clerk, be guilty of misdemeanors involving moral turpitude.”
Defendants’ moving papers are entirely devoid of any factual showing of intentional, planned and deliberate exclusion of or discrimination against members of any particular political or economic group, religious faith, race or sex in summoning and selection of grand or petit jurors. The statement above quoted, which comes from defendants’ memorandum of law, is not a factual showing; it is merely a conglomeration of unsupported conclusions, generalizations, and conjectures.
Defendants’ factually unsupported contentions are insufficient to bring into question the validity of the selection and composition of the Grand Jury which returned the indictments in this matter. I find, as hereinafter set forth, that the statutes *714 attacked by defendants do not suffer from any constitutional defect and that nothing has been presented of a factual nature to support the claim that the selection of grand jurors in Queens County, because of the alleged small ratio of Negroes empaneled to serve on grand juries in proportion to their percentage in the population (which is not documented and is gratuitously assumed), is violative of the Fourteenth and Fifteenth- Amendments to the United States Constitution.
I
A consideration of the constitutionality of a statute commences with the basic principle that constitutionality is presumed. (8 N. Y. Jur., Constitutional Law, § 59.) A party who alleges the unconstitutionality of a statute has the burden of sustaining such claim and, to do so, must overcome the presumption of constitutionality. (8 N. Y. Jur., Constitutional Law, § 77.) Only in a clear case will a statute be held to be constitutionally defective and ‘ ‘ the challenged legislation must be manifestly, undoubtedly, clearly, plainly, substantially, and palpably inconsistent with constitutional standards.” (8 N. Y. Jur., Constitutional Law, § 79.) This, defendants have not demonstrated.
Proper administration of justice may require that persons who are to act as jurors meet some minimal requirements of intelligence and integrity. Equality under the law does not require that every person who is a citizen and within a certain age group has the right to serve as a juror regardless of -the state of his mentality, health or background. Surely equal protection of the law does not require that a moron, or a psychotic, or one suffering from a debilitating disease may not be stricken as a juror. In the nature of the problem it is nothing less than reasonable to require that a juror, to be qualified to serve, must be intelligent, of sound mind and good character, and well informed.
Those standards are not purely subjective, as defendants dogmatically label them. Though there may be some differences and shades of opinion as to whether a person is intelligent, of sound mind and of good character, these characteristics are fairly universally standardized. The fact is that they are appraised constantly in daily human intercourse, and are part of living. In Matter of Ford v. O’Byrne (222 App. Div. 50, 51) it was said: “ 1 Intelligent ’ as used in the Judiciary Law means possessed of ordinary information and reasoning faculty.” Similarly, the term “ moral turpitude ” has been defined many *715 times in the context of the law and has become standardized to snch a degree that it cannot be said that it involves a subjective judgment. Merriam-Webster’s New International Dictionary (2d ed.) defines moral turpitude as ‘6 the quality of a crime involving grave infringement of the moral sentiment of the community as distinguished from statutory mala prohibita.” And in Mishkin v. Roreck (202 Misc. 653, 656) moral turpitude was defined as “ an act of baseness, vileness or depravity in the private or social duties which man owes to his fellow-men or to society in general, contrary to the accepted and customary rule of right and duty between man and man.” (Emphasis supplied.) ‘ Significantly, the only illustration defendants offer in support of their dogmatic assertion that the provision regarding a conviction of a misdemeanor involving moral turpitude sets up a “ subjective ” standard is the following: “ Negroes arrested for a demonstration to secure basic civil rights and convicted of misdemeanors in connection therewith might well, in the view of the County Clerk, be guilty of misdemeanors involving moral turpitude.” This is a far-fetched thesis and utterly without merit. In Sinclair v. United States (279 U. S. 263, 299) the United States Supreme Court held that a conviction of contempt of Congress does not involve moral turpitude. (Also, see, People v. Cook, 220 App. Div. 110,112 [1927], holding that selling intoxicating liquors is not, under the Federal law, a crime involving moral turpitude, and Matter of Browning, 176 Misc. 308, holding that the crime of bribery involves moral turpitude.)
The fact that the judgment to be exercised by the Jury Clerk entails the use of some discretion does not render such judgment so subjective ■ that it collides with constitutional concepts of equality. An attempt by the Clerk to apply standards of “ intelligence ” or “ moral turpitude ” different from those, generally accepted would constitute an arbitrary and capricious abuse of discretion. (Cf. Matter of Barton Trucking Corp. v. O’Connell, 7 N Y 2d 299, 312-313.) To hold that no discretion at all may constitutionally be lodged in the Clerk to pass on the qualifications of a prospective juror as set forth in the Judiciary Law is to hold that this equal protection guarantee is satisfied by a rigid requirement that each and every person of the class from which jury lists are taken mUst.be placed upon such lists, regardless of his lack of intelligence, even though he may not be of sound mind and though he may be the most dissolute and dishonest character, and even though he may have been convicted many times of misdemeanors involving moral turpitude such as tampering with a witness (Penal Law, § 215.10), tarn *716 pering with a juror (Penal Law, § 215.25), or misconduct of a juror (Penal Law, § 215.30).
Chestnut v. People of State of New York (370 F. 2d 1, supra) and Louisiana v. United States (380 U. S. 145), relied .upon by defendants, do not support their contention in this regard. In Chestnut a constitutional attack was made upon the provisions of the Judiciary Law here under consideration upon the claim that the requirements that a grand juror be ‘1 intelligent; of sound mind and good character; well informed,” resulted in a great majority of qualified Negro and Puerto Rican citizens and members of low income groups being excluded from jury service in violation of the Fourteenth and Fifteenth Amendments of the United States Constitution. The court there held that since the provisions of the Judiciary Law did not on their face discriminate in terms of race and the alleged denial of petitioners’ civil rights was “not manifest in the formal expression of state laws ” (p. 5), the petitioners’ claim did not qualify under the Federal civil rights law for removal of pending State charges to the Federal court for trial. The court then went on to state (pp. 6-7): “It should be noted, however, that our conclusion that appellants have .not met the requirements of § 1443(1) for removal to a federal tribunal at this juncture of the state’s prosecution, is in no manner a determination by this Court that §§ 596 and 609 of the New York Judiciary Law are constitutional. We are confident that in light of recent decisions by the Supreme Court and federal appellate courts in other Circuits, that New York will give careful consideration to the very serious constitutional issues that appellants raise concerning the State’s Grand Jury selection procedures.” However, in a footnote on page 7 the court expressed its doubt of the constitutionality of those provisions.
The main thrust of defendants ’ argument concerning the constitutionality of the provisions of the Judiciary Law is bottomed entirely upon that footnote dictum. In People v. Cohen (54 Misc 2d 873), where the claim here made concerning the constitutionality of the statutes in question was also made, the defendant’s argument was also based on this dictum in Chestnut. The court in Cohen stated (pp. 876-877) that “ the observation by the Federal court in the Chestnut case concerning the statutes under consideration is no formed decisive resolution, no adjudication and no professed or deliberate determination and lends little or no support to the defendant I agree.
Apart from the fact that this dictum is not controlling here, I do not accept it because I do not agree with its rationale. The doubt expressed by the court in Chestnut about sections 596 *717 and 609 of the Judiciary Law rested in the main upon the decision in Louisiana v. United States (380 U. S. 145, supra) in which the Supreme Court found unconstitutional a State requirement that voters be able to interpret any part of the Louisiana or United States Constitution, because, as the court held (p.7), of the “ arbitrary power that it gave to state election officials to pick and choose by their own standards who can or cannot vote.” (Emphasis supplied.) I do not agree that our statutes requiring that a grand juror be ‘ ‘ intelligent; of sound mind and good character; well informed” is at all comparable with the Louisiana statute which was condemned as unconstitutional, or that the holding in the Louisiana case is at all applicable to the statutes of this State.
In the Louisiana case the court found that all constitutional and statutory provisions dealing with qualifications and eligibility of voters were deliberately designed to disfranchise Negroes, culminating in the amendment of the Louisiana State Constitution, in 1960, so as to require every applicant for enrollment as a voter thereafter to “be able to understand ” as well as “give a reasonable interpretation” of any section of the State or Federal Constitution ‘ ‘ when read to him by the registrar.” It was then found as a fact the test was employed as a deliberate and systematic scheme to deny to Negroes their right of franchise. As the court observed (p. 153): “As the evidence showed, colored people, even some with the most advanced education and scholarship, were declared by voting registrars with less education to have an unsatisfactory understanding of the Constitution of Louisiana or of the United States. This is not a test but a trap, sufficient to stop even the most brilliant man on his way to the voting booth. The cherished right of people in a country like ours to vote, cannot be obliterated by the use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar. Many of our cases have pointed out the invalidity of laws so completely devoid of standards and restraints.” The court also found (p. 150): “ The interpretation test, the court found, vested in the voting registrars a virtually uncontrolled discretion as to who should vote and who should not. Under the State’s statutes and constitutional provisions the registrars, without any objective standard to guide them, determine the manner in which the interpretation test is to be given, whether it is to be oral or written, the length and complexity of the sections of the State or Federal Constitution to be understood and interpreted, and what interpretation is to be considered correct. There was ample evidence to support the District Court’s finding that *718 registrars in the 21 parishes where the test was found to have been used had exercised their broad powers to deprive otherwise qualified Negro citizens of their right to vote; and that the existence of the test as a hurdle to voter qualification has in itself deterred and will continue to deter Negroes from attempting to register in Louisiana.”
Another consideration militates persuasively against the Louisiana case being considered apposite on the question of the constitutionality of the New York statute. Louisiana was handed down by the United States Supreme Court on March 8, 1965. On the same day, Swain v. Alabama (380 U. S. 202) was also handed down. Swain involved a claim of the deliberate and systematic exclusion of Negroes from jury service, and the Supreme Court found that the claim had not been established. Significantly, the Alabama statute regarding the qualifications of persons to be on a jury roll is almost identical with our statutes. The Alabama statute (Ala. Code, tit. 30, § 21), as set forth at page 206 of Swain, provided that: ‘‘ The jury commission shall place on the jury roll and in the jury box the names of all male citizens of the county who are generally reputed to be honest and intelligent men and are esteemed in the community for their integrity, good character and sound judgment; but no person must be selected who is under twenty-one or who is an habitual drunkard, or who, being afflicted with a permanent disease or physical weakness is unfit to discharge the duties of a juror; or cannot read English or who has ever been convicted of any offense involving moral turpitude. If a person cannot read English and has all the other qualifications prescribed herein and is a freeholder or householder his name may be placed on the jury roll and in the jury box. No person over the age of sixty-five years shall be required to serve on a jury or to remain on the panel of jurors unless he is willing to do so.” If the finding of the court in Louisiana had any impact upon the situation in Swain, it is fair to assume that the Supreme Court would have made some observation with reference thereto, even though no constitutional attack may have been made on the Alabama statute. (Cf. Louisiana v. United States, supra, p. 151, where the court mentioned a holding made in a case decided on the same day.)
n
“ A defendant in-a criminal case has no constitutional right to be indicted or tried by any particular jury, or by a jury composed in part of members of his race or class ” (5 Wharton’s *719 Crim. Law & Pro. [1957], p. 84; also, see, Ann. 1 ALR 2d 1291; People v. Dessaure, 299 N. Y. 126, cert. den. 337 U. S. 949). In People v. Brophy (304 N. Y. 391, 394) the Court of Appeals quoted, with approval, the following from Fay v. New York (332 U. S. 261, 288-289): “ The defendant’s right is a neutral jury. He has no constitutional right to friends on the jury.” Only where there is an intentional, deliberate and systematic exclusion of or discrimination against members of a particular political or economic group, religious faith, race or sex in the summoning and selection of jurors is there an infringement of the right to due process and equal protection of the law. (People v. Agron, 10 N Y 2d 130, 141; Fay v. New York, supra, p. 291; Akins v. Texas, 325 U. S. 398, 403.) In Swain v. Alabama (380 U. S. 202, supra), whore the proof was that jury lists were compiled from disparate sources such as city directories, registration lists, and suggestions made by residents of the county, the United States Supreme Court said (p. 208): <£ Venires drawn from the jury box made up in this manner unquestionably contained a smaller proportion of the Negro community than of the white community. But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. Virginia v. Rives, 100 U. S. 313, 322-323; Gibson v. Mississippi, 162 U. S. 565; Thomas v. Texas, 212 U. S. 278, 282; Cassell v. Texas, 339 U. S. 282. Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. 1 Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race and no discrimination because of color, proportional limitation is not permissible.’ Cassell v. Texas, 339 U. S. 282, 286-287 (opinion of Mr. Justice Beed, announcing judgment).”
As with all claims of constitutional violations, to raise an issue as to the constitutionality of the impaneling of a grand or petit jury a factual demonstration that there is in truth such an issue is .required. (Darcy v. Handy, 351 U. S. 454, 462; Hawk v. Olson, 326 U. S. 271, 277; Walker v. Johnston, 312 U. S. 275, 286; People v. Richetti, 302 N. Y. 290, 297; cf. People ex rel. Eich v. Wilkins, 17 N Y 2d 621.) A mere conclusory and factually unsupported statement that the Grand Jury was unconstitutionally formed in that there was a systematic and intentional exclusion of members of a particular race does not *720 create an issue. (People v. Dessaure, 193 Misc. 381, 382; cf. Matter of Koota v. Bonanno, 52 Misc 2d 748, 759.) “ Purposeful discrimination may not be assumed or merely assorted” (Swain v. Alabama, supra, p. 205). There.is a presumption of regularity and of due performance of duty on the part of officials. (People v. Dessaure, supra, p. 386.)
Defendants here have failed to make any factual showing sufficient to raise an issue that there was a deliberate and systematic exclusion of Negroes from service on grand juries. The only assertion made by defendants in this regard is that “ it is a matter of common observation in Queens County that most grand juries consist solely of white people, and at best Negroes represent an occasional token representation on such bodies,” and that “ since the proportion of Negroes in the population of Queens 'County is at least one-sixth that of the general population, it is impossible to believe that this lack of representation on the grand juries is fortuitous.” I repeat what I said before, this is not a statement of fact but is merely an undocumented and unsupported conclusion and inference. The “ mere absence of any members of an eligible class or race from a particular jury or panel is not proof, in and of itself, of the exclusion of that class or race from jury service ” (Ann. 1 ALR 2d p. 1293)., In Swain v. Alabama (supra, pp. 208-209) the court said: “ We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%.” In that case it was factually established that Negro males constituted 26% of all those eligible to be impaneled as jurors; that 10% to 15% of the grand and petit jury panels drawn since 1953 had Negroes thereon; and although since 1950 there were six or seven Negroes on petit jury venires, no Negro actually served. Yet the Supreme Court did ‘ ‘ not consider an average of six to eight Negroes on these panels as constituting forbidden token inclusion within the meaning of the cases in [that] Court.” (p. 206). The motion lacks merit and is in all respects denied.