[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 797 
The appellant was convicted by a jury upon an Information for Impeachment, and based upon that verdict the trial court decreed that the appellant was impeached and removed from office. This appeal is from that judgment. We affirm.
The appellant became Circuit Clerk of Choctaw County on March 1, 1977. She also served as ex-officio clerk of the District, Juvenile and Small Claims Courts of Choctaw County. Prior to that time she had served as chief deputy clerk, beginning on September 27, 1973, and she assumed the duties as Clerk upon the resignation of her predecessor.
During the month of June, 1978 the appellant notified the Sheriff of Choctaw County of a shortage of funds in her office and that some investigation was needed. The appellant also informed the district attorney of the matter, describing the shortage as an amount in excess of Fourteen Thousand Dollars. That approximate amount coincided with that reported to the district attorney by a State auditor. It was during the investigations of this shortage that the facts came to light which ultimately resulted in the charges which led to the appellant's conviction.
Those charges were contained in an Amended Information of Impeachment and Prayer for Ouster, themselves based upon impeachment recommendations of the Choctaw County Grand Jury, Spring Term 1979. Charge One was Willful Neglect of Duty. Specifications 10 and 12 were considered by the jury:
 10. For that during her present term of office, said Clerk, while serving in her official capacity as said Clerk, did commit an act or acts constituting or amounting to willful neglect of her official duty in that she did fail to meet and perform her duty to, periodically, but in no event less than once a month, not later than the tenth day of each month, remit all
fines, forfeitures and costs of court, to the official or officials designated to receive such at the various governmental levels, to-wit, municipal, county and State as provided by law or rule, against the peace and dignity of the State of Alabama.
 12. For that during her present term of office, said Clerk, while serving in her official capacity as said Clerk, did commit an act or acts constituting or amounting to willful neglect of her plain and manifest duty in that (1) she allowed large sums of cash money to accumulate in her office, and (2) she did not maintain at all times a depository in her office under lock and key for such large sums of accumulated funds, and (3) she instituted a practice whereby she was allowed to withdraw from such large sums of accumulated funds for her own private use, and as a result of such lax and unsound basic business practices public funds belonging to Choctaw County, Alabama, or to the State of Alabama, were misappropriated or misused, all of this being against the peace and dignity of the State of Alabama.
Charge Two was Corruption in Office. Specifications 1, 6, 7, 8, 9, 10 and 11 were considered by the jury in connection with Charge Two:
1. For that said Clerk did misuse and misappropriate public funds and monies which had come into her office through the official receipts of revenue, which is public revenue, from which payments to litigants, the County of Choctaw, the State of Alabama, the Judges' and District Attorney's Fund of Choctaw County, Alabama, and other official entities, persons and funds are to be made, by appropriating and converting to her own use large sums of said money and funds, extending over a period of months, from about, to-wit, March of 1977, through and including, to-wit, the latter months of 1977, better and more accurate times for which are unknown to the Grand Jury. *Page 798 
6. For that said Clerk, being charged or in any manner intrusted with the collection, receipt, safekeeping, transfer or disbursement of money and funds belonging to or under the control of the State of Alabama or of any State officer, to-wit, the Circuit Clerk of Choctaw County, Alabama, being also the Ex-Officio Clerk of the District Court of Choctaw County, Alabama, being the Ex-Officio Clerk of the Juvenile Court of Choctaw County, Alabama, and being the Ex-Officio Clerk of the Small Claims Court of Choctaw County, Alabama, hereinafter referred to as said Clerk, or belonging to or under the control of any county, to-wit, Choctaw County, Alabama, or any officer thereof, to-wit, said Clerk, did convert to her own use or to the use of another, in a manner contrary to law, or did use by way of loans, without interest, or did deposit with any person or corporation contrary to law, or did exchange for other funds, to-wit, her own personal bank checks, in a manner other than as allowed by law, money, lawful currency of the United States of America, of the value of, to-wit, Seven Thousand One Hundred Seventy-Two and 25/100 ($7,172.25) Dollars, the exact denominations of which and a better description of which are unknown to the Relator, being portions of such money and funds, the collection, receipt, safekeeping, transfer, or disbursement of which the said Clerk had been charged or intrusted with, to about the amount of, to-wit, Seven Thousand One Hundred Seventy-Two and 25/100 ($7,172.25) Dollars, against the peace and dignity of the State of Alabama.
7. For that said Clerk, being a clerk of a circuit court, to-wit, the Clerk of the Circuit Court of Choctaw County, Alabama, and being the Ex-Officio Clerk of the District Court of Choctaw County, Alabama, being the Ex-Officio Clerk of the Juvenile Court of Choctaw County, Alabama, and being the Ex-Officio Clerk of the Small Claims Court of Choctaw County, Alabama, a public officer, did knowingly convert to her own use, portions of the revenue of the State of Alabama, or of a county thereof, to-wit, Choctaw County, Alabama, or did knowingly convert to her own use, money, lawful currency of the United States of America, of the value of, to-wit, Seven Thousand One Hundred Seventy-Two and 25/100 ($7,172.25) Dollars, the exact denominations of which and a better description of which are unknown to the Relator, which said money was paid into her office or received by her in her official capacity, all to about the amount of, to-wit, Seven Thousand One Hundred Seventy-Two and 25/100 ($7,172.25) Dollars, against the peace and dignity of the State of Alabama.
8. For that said Clerk, being a public officer receiving money on behalf of, for, or on account of the people of the State, to-wit, the State of Alabama, or for or on account of a county of the State, to-wit, Choctaw County, Alabama, being, to-wit, the said Clerk, did appropriate to her own use or the use of another not entitled thereto, without authority of law, sums of money, lawful currency of the United States of America, of the value of, to-wit, Seven Thousand One Hundred Seventy-Two and 25/100 ($7,172.25) Dollars, the exact denominations of which and a better description of which are unknown to the Relator, the said money being so received by her, the said Clerk, as such officer, or otherwise, to about the amount of Seven Thousand One Hundred Seventy-Two and 25/100 ($7,172.25) Dollars, against the peace and dignity of the State of Alabama.
9. For that said Clerk, being a public officer receiving money on behalf of, for, or on account of the people of the State, to-wit, the State of Alabama, or for or on account of a county of the State, to-wit, Choctaw County, Alabama, being, to-wit, the said Clerk, did willfully omit or refuse to pay over to the State, to-wit, the State of Alabama, its officer or agent or officers or agents authorized by law to receive the same, or to such county of the State, to-wit, Choctaw County, Alabama, or to the proper officer or authority or officers or authorities empowered to demand and receive the same, sums of money, lawful currency of the United States of America, of the value of, to-wit, Seven Thousand One Hundred Seventy-Two and 25/100 *Page 799 
($7,172.25) Dollars, the exact denominations of which and a better description of which are unknown to the Relator, the said money being received by her as such officer, to about the amount of Seven Thousand One Hundred Seventy-Two and 25/100 ($7,172.25) Dollars, it being then and there a duty imposed upon her by law to pay over and account for the same, against the peace and dignity of the State of Alabama.
10. For that said Clerk did use her official position or her office to obtain direct personal financial gain for herself, or her family, such gain not specifically authorized by law, in that she did place personal bank checks in an envelope in her office or did direct an employee of her office, under her direction and supervision, to place said Clerk's personal bank checks in an envelope in her office, and in exchange for said personal bank checks, the said Clerk received monies, and she did not process said bank checks through her bank account, but rather allowed them to accumulate and to be kept in said envelope over a period of several months, never being cashed or processed in the manner in which bank checks are used in financial transactions, this being for her direct personal financial gain, or for that of her family, in that she thus obtained the personal use of said monies, which were public monies received by said Clerk in her official capacity or on behalf of, or for, or on account of the State of Alabama, or on behalf of, or for, or on account of the county of Choctaw County, Alabama, or received in her office for or on account of said State or said County, this obtaining of such personal use of such public monies being in the nature of unauthorized, interest-free loans, against the peace and dignity of the State of Alabama.
11. For that said Clerk, during the year 1977, or during the year 1978, or during the years 1977 and 1978, did use public funds coming into her possession as said Clerk, for her own private use or benefit, against the peace and dignity of the State of Alabama.
Charge Three alleged that the appellant had been guilty of offenses involving moral turpitude while in office. Specifications 1, 2, 3, 4, 5 and 6 were put to the jury in support of Charge Three:
 1. The State of Alabama hereby incorporates and adopts by reference thereof, Charge Two, Specification 6, as hereinabove averred in this Amended Information of Impeachment and Prayer For Ouster, the same as if fully set out herein in verbatim.
 2. The State of Alabama hereby incorporates and adopts by reference thereto, Charge Two, Specification 7, as hereinabove averred in this Amended Information of Impeachment and Prayer For Ouster, the same as if fully set out herein in verbatim.
 3. The State of Alabama hereby incorporates and adopts by reference thereto, Charge Two, Specification 8, as hereinabove averred in this Amended Information of Impeachment and Prayer For Ouster, the same as if fully set out herein in verbatim.
 4. The State of Alabama hereby incorporates and adopts by reference thereof, Charge Two, Specification 9, as hereinabove averred in this Amended Information of Impeachment and Prayer For Ouster, the same as if fully set out herein in verbatim.
 5. The State of Alabama hereby incorporates and adopts by reference thereto, Charge Two, Specification 10, as hereinabove averred in this Amended Information of Impeachment and Prayer For Ouster, the same as if fully set out herein in verbatim.
 6. The State of Alabama hereby incorporates and adopts by reference thereto, Charge Two, Specification 11, as hereinabove averred in this Amended Information of Impeachment and Prayer For Ouster, the same as if fully set out herein in verbatim.
The appellant has presented three questions for our review which will be considered seriatim:
A. Whether the trial court committed reversible error by applying the Rules of Civil Procedure to this impeachment proceeding rather than the rules of criminal procedure; *Page 800 
B. Whether the trial court committed reversible error in refusing to grant appellant's motion to exclude the State's testimony and direct a verdict for the appellant; and
C. Whether the trial court erred in refusing to grant appellant's motion for a mistrial or in the alternative to exclude testimony offered by a witness concerning acts done prior to her appointment as circuit clerk.
 A.
At the beginning of the trial proceedings the trial court made the following ruling:
 A little of the ground rules. This cause is governed by the Civil Rules of Procedure. Of course, under your one and one strike. And also, except for the fact it must be — guilt must be beyond a reasonable doubt and to a moral certainty. You must satisfy the jury beyond a reasonable doubt and to a moral certainty.
Though not claiming any error in the jury selection procedure announced, the appellant has cited a number of cases in which it is stated generally that impeachment trials are criminal in nature, e.g., Parker v. State, Ala., 333 So.2d 806 (1976); Alonzov. State, 283 Ala. 607, 219 So.2d 850 (1969); State v. Mathews,259 Ala. 125, 66 So.2d 105 (1953). An examination of those and other cases on that subject reveals that each case concerned an issue dealing with a constitutional safeguard, not the general application of criminal rules of procedure. In Mathews, supra, the question was whether the proceeding could be initiated by private individuals through the use of private counsel without the authority of the attorney general. Alonzo, supra, concerned the legality of an impeachment proceeding being prosecuted by privately retained counsel. Parker, supra, dealt with the constitutionality of a removal from public office because of conduct occurring before the commencement of his term of office. While these and other decisions contain language describing an impeachment proceeding as a criminal proceeding, it is clear that such statements have been made in certain contexts, and that such proceedings actually possess a nature that is both criminal and civil.
The legislature has addressed itself to the manner in which impeachment trials shall proceed. Code of Ala. 1975, § 36-11-14
states:
 The case [an information for impeachment] . . . shall be proceeded with in all respects as civil actions are conducted. . . .
Rule 81 (a)(14), ARCP specifically encompasses impeachment proceedings "to the extent that the practice in such matters is not provided by statute."
In State v. Washburn, Ala., 349 So.2d 20 (1977) (contrary to its position in this instance) the State of Alabama contended that the Rules of Civil Procedure did not apply to an impeachment based upon violations of criminal laws. This Court rejected that contention:
 As noted, the State contends the discovery provisions of ARCP are not applicable to an impeachment proceeding concerned entirely with allegations of factual transactions which constitute violations of criminal law. We do not agree. Authorities relied upon by the State do in fact denominate impeachment proceedings as penal in nature; a criminal prosecution in which defendant has certain constitutional rights; a proceeding in the nature of a criminal prosecution; and partakes of the nature of both civil and criminal actions. See Alonzo v. State ex rel. Booth, 283 Ala. 607, 219 So.2d 858. Since such proceedings seem to be unique hermaphroditic creatures, we must look to the structures provided by the legislature and this court to determine how we must regard impeachment with respect to procedural processes.
 We find no difficulty in holding that Rule 81 (a)(14), ARCP, makes applicable to these proceedings the discovery rules of ARCP. Section 189, Title 41, Code, makes clear that the cause (impeachment) shall be proceeded with in all respects as civil actions at law are conducted. Section 193 provides for witness fees as in civil cases; the statutes are otherwise *Page 801 
silent regarding discovery procedures; and this court has rule making power under our constitution; Rule 81 (a)(14) supplies otherwise nonexistent procedures for the conduct of impeachment proceedings, thus it seems clear ARCP governs the conduct of this impeachment case.
It would be incorrect to conclude that there are no criminal procedure rules available in an impeachment proceeding. The defendant in such cases is entitled to certain constitutional and statutory protections accorded to defendants in exclusively criminal cases. It is clear from the trial court's oral charge to the jury that those rights were accorded:
 Ladies and gentlemen, when these charges were brought into court on the grand jury recommendation and this defendant came into court as she did do and in answer to these charges pleaded not guilty, then that function of the grand jury ceased. There is no inference of any guilt of those charges because the grand jury returned that report or because an information of impeachment was returned because this defendant, as are all defendants in this type case is presumed to be innocent of any charge until the State of Alabama has from the evidence presented here convinced you beyond a reasonable doubt and to a moral certainty of the guilt of the charges. So then, this defendant stands presumed to be innocent and that presumption goes with her at all times until you have been convinced beyond a reasonable doubt and to a moral certainty of the truth of the charge or of guilt. Now, when we tell you that you must be convinced beyond a reasonable doubt that does not mean that you must be convinced beyond all doubt. It certainly does not mean a fanciful doubt or imaginary doubt. It means just what the term implies: a reasonable doubt, and our courts have said that a reasonable doubt is a reason for arising out of the evidence, [sic] a reason that you can account for. So, if after hearing and considering all of the evidence, that of the State and that of the defendant, you have an abiding conviction of the truth of the charge, you may say that you have then been convinced beyond that reasonable doubt.
Moreover, the record fails to reveal any objection on the defendant's part either to the trial court's initial reference to the civil rules or to its oral instruction. The only reference to the distinction between a civil and a criminal proceeding which took place in the trial dealt with the application of a point of evidence law during the direct examination of a State's witness, and the defendant's objections to that proffer were sustained. Nor have we been directed otherwise to any error of the trial court in which it is alleged that the appellant has been denied substantive or procedural due process of law. Consequently we fail to find any prejudice resulting to the appellant from the trial court's conduct of the trial under its earlier pronouncement.
 B.
Under this second ground the appellant insists that there was insufficient evidence to support an impeachment under the grounds permitted by law.
Sections 173 and 175 of the Constitution of 1901 prescribe the grounds for which a circuit clerk may be removed from office. Those grounds include: willful neglect of duty, corruption in office, and "for any offense involving moral turpitude while in office. . . ." The appellant was charged with violations of each of those grounds.
Under Specification of 10 of the willful neglect of duty charge, it was alleged that the appellant failed to remit all fines, forfeitures and costs of court to the remittees provided by the law at the times required. This specification is based upon Code of 1975, Rule 4 of the Rules of Judicial Administration, paragraph (H):
 The clerk and register shall, periodically, but in no event less than once a month, not later than the tenth day of each month, remit all fines, forfeitures and costs of court, including prepaid docket fees, to the official designated to *Page 802 
receive such at the municipal, county and state level, as provided by law or rule; provided, that on September 25 of each year, the clerk or register shall remit all fines, forfeitures and costs of court, including prepaid docket fees, to the official designated to receive such at the municipal, county and state level, as provided by law or rule.
In support of this specification the State offered the testimony of Ms. LaSonia Abston who was, from March 1, 1977 until April 30, 1979, chief deputy clerk and bookkeeper under the appellant. It was she who found the first shortage in October, 1977, something over Six Thousand Dollars ($6,000.00) at that time. This witness testified to the system used by the appellant in taking cash from the office receipts and substituting her personal checks therefor, and the retention of those uncashed checks in the office as the shortage grew. At one point she stated:
 [W]e were having to use money from the preceding month to make the deposits — the following month to make the deposits for the preceding month.
. . . . .
 Because of the shortage. So that deposit was made for that account for the preceding month.
The appellant's own testimony supported this practice:
 Q . . . You took Six Thousand Dollars of the State's money. Where did the State get their Six Thousand Dollars?
A Out of that cash box.
 Q How did they do that if you had taken it over and put it in your account?
 A I sent in the money that was receipted for a one month period. And by the time we got ready to make the deposits and send out checks, we were into the next month and there was enough money to cover it.
 Q That's just what LaSonia Abston testified to, wasn't it, Mrs. Lewis?
A Yes.
 Q You used June's money to make up for what was missing in May, didn't you?
A Yes.
. . . . .
Q You used Six Thousand Dollars of the State's money.
A I wrote checks, yes.
Q How did the State get that money back?
 A I borrowed the money from the bank and put it back there.
 Q How many months was that after you started taking that money?
A From March of '77 to January of '78.
Q Eleven months?
A Yes, sir.
 Q Why did you decide to pay it back after eleven months?
 A I just didn't decide then. That was the first chance I got to go down and take care of it.
 Q In eleven months, that was the first chance you got to take care of it?
A That's right.
 Q What had you been doing eleven months that kept you so busy that you couldn't walk across the street and borrow the money?
A I just never got around to it.
This evidence was sufficient on which to conclude that the appellant's failure to perform her duty to periodically remit the fines, etc. received in her office was a willful neglect, and constituted a sufficient basis on which to find her guilty of the charge of Willful Neglect of Duty.
Specification 12 charged the appellant with willful neglect of duty for (1) allowing large sums of cash to accumulate in her office, (2) for not maintaining an office depository under lock and key for the large accumulated sums, and (3) for instituting a practice of large withdrawals from such funds for her private use, resulting in the misappropriation or misuse of these public funds.
The appellant argues that this charge falls because the allegation did not meet the test of willful neglect of duty as determined by case law, citing Bowen v. State, 207 Ala. 672,93 So. 412 (1922), for the proposition that: *Page 803 
 [W]illful neglect . . . means more than the merely intentional omission of an act of public duty; that, to justify removal from office, it must appear that the incumbent is morally or mentally unfit; that unfitness is an inferential fact, to be found by the jury which the Constitution guarantees in the cases of officers impeachable. . . . [Quoted from Nelson v. State, 182 Ala. 449, 461, 62 So. 189, 193 (1913).]
The appellant maintains that not only was there no evidence meeting this standard, but that no statute required a locked cash register.
That argument is unpersuasive. The evidence establishes that until June, 1978, the cumulative cash receipts in the clerk's office were kept in a metal box in the middle drawer of a desk, and at the end of each day this box was locked and placed in the clerk's desk. After that date the office utilized a night deposit bag procured from a bank. The receipts were placed in that bag and kept in an office desk during the day and placed in the bank night deposit vault each night. Prior to that time bank deposits had been made once each month. The night deposits were not actually deposits but depositories for security purposes. Only the appellant and Ms. Abston had keys to the vault door. There is also evidence of substantial cash shortages before the daily security deposit was undertaken. Ms. Abston found the first shortage in October, 1977, an amount over Six Thousand Dollars. That shortage had grown to Ten Thousand Dollars in November; in December it had increased to Twelve Thousand Dollars, and in January, 1978 it had reached over Fourteen Thousand Dollars. The appellant was informed of each shortage as it was discovered, yet no change in fiscal management occurred until June, 1978. At this same time the appellant was cashing her personal checks with office funds and holding those checks until she could replace the funds. These checks aggregated a little over Six Thousand Dollars in amount, although not the same Six Thousand reported as missing in October. During this time no audit was requested by the appellant although the appellant and Ms. Abston discussed that possibility. The record also establishes that another office employee confessed to having taken about Two Thousand Dollars during this period. Taken together, this evidence compels the conclusion that the appellant was guilty of more than some isolated technical violation; that she not only knowingly countenanced but promoted risky office procedures, through mismanaged cash accumulations over a period of time which not only enured to her personal benefit but resulted in other malefactions. Thus the jury's finding of "willful neglect of duty" under Specification 12 was sufficiently established.
Charge Two, corruption in office, was alleged in seven specifications: 1, 6, 7, 8, 9, 10 and 11.
Specification One charged misuse and misappropriation of public funds by "appropriating and converting to her own use large sums of . . . money . . from . . . March of 1977, through . . . the latter months of 1977 . . ." The testimony of both the appellant and Ms. Abston supports this charge. The appellant used the public funds of the clerk's office as her personal bank, exchanging her personal checks for cash of more than Six Thousand Dollars, and knowingly retaining them against the advice of her deputy clerk and bookkeeper, for a period of time beginning in March, 1977 and ending in January, 1978 when she replaced those funds. The jury could have found from the evidence that the replacement itself was made only after the urging of the office bookkeeper. The fact that the money ultimately was repaid does not militate against the conduct alleged, from which the jury could have believed, under the evidence, that the money was withheld with intent to defraud. State v. Hasty, 184 Ala. 121,63 So. 559 (1913).
The other specifications of Charge Two, 6 through 11, are the same specifications contained under Charge Three on Moral Turpitude. The appellant discusses these together and complains that their allegations are *Page 804 
insufficient because: (1) none of them cites a Code section which she allegedly violated, (2) none of them alleges an intent to defraud, and (3) none of them alleges that her acts were willfully committed.
Contrary to the appellant's position, Hasty, supra, does not require that every allegation of corruption or commission of an offense involving "moral turpitude," made the basis of an impeachment proceeding, should specifically allege the violation of a statute. Nor does the case of Mitchell v. State, 248 Ala. 169, 27 So.2d 36 (1946), cited by the appellant, and which dealt with the requirements for an indictment for the criminal offense of conspiracy. In Hasty it is apparent that the State's counsel was relying upon a specific offense contained in the Code of 1907 as a ground for impeachment (the conversion of county funds by officers). This Court held that:
 [I]f it [the State] must rely upon the commission of an offense as covered by the fourth ground in section 173 of the Constitution, to wit, the commission of an offense involving moral turpitude while in office or committed under color thereof, the said offense should be specifically charged, as is required by section 7103 of the Code of 1907. We find no charge in the information specifically covering a violation of the foregoing statute or charging a conversion thereunder by depositing county funds in bank without requiring a bond as security for same and as is provided in the act.
Contrary to the situation in Hasty, it is not shown in this case that the State was relying upon any specific statutory violation on which to base an allegation of either corruption or the commission of an offense. The phrase "any offense involving moral turpitude" contained in § 173, Constitution of 1901, is not by its terms restricted to statutory offenses, thus it also includes offenses at common law. See, e.g., Parker v. State, Ala.,333 So.2d 806 (1976) (solicitation to commit a felony); cf. Code of Ala. 1975, § 13-9-43 (common law solicitation remains an offense in Alabama). The term "moral turpitude," moreover, describes "[t]he quality of a crime involving grave infringement of the moral sentiment of the community as distinguished from statutory mala prohibita." People v. Ferguson, 55 Misc.2d 711, 286 N.Y.S.2d 976,981 (1967). Specification Six under the corruption charge (Specification 1 of the moral turpitude charge) alleges that the appellant converted to her own use or to the use of another, or used by way of loans without interest, or deposit with any person or corporation, or exchanged with other funds, contrary to law in each instance, to wit, Seven Thousand One Hundred Seventy-Two and 25/100 Dollars, with which she as clerk had been entrusted.
Specification Seven under the corruption charge (Specification 2 of the moral turpitude charge) charged that the appellant had knowingly converted, to wit, Seven Thousand One Hundred Seventy-Two and 25/100 Dollars, revenue of the State, or knowingly converted to her own use that sum which had been paid into her office or received by her in her official capacity. Specification Eight under the corruption charge (Specification 3 under the moral turpitude charge) charged that the appellant, a public officer receiving money on behalf of the people of the State of Alabama, appropriated to her own use or the use of another not entitled thereto, without authority of law, sums of money of the value of, to wit, Seven Thousand One Hundred Seventy-Two and 25/100 Dollars, that money being so received by her as such officer. Specification Nine (Specification 4 under the moral turpitude charge) charged that the appellant willfully omitted or refused to pay over to the State of Alabama sums of money, to wit, Seven Thousand One Hundred Seventy-Two and 25/100 Dollars received by her as a public officer, it being her duty under law to do so. Specification Ten (Specification 5 under the moral turpitude charge) charged the appellant with having used her official position or her office to obtain direct personal financial gain for herself or her family, not authorized by law, in the practice of using money officially received in exchange for her personal checks which were not processed but retained over a period of months. Specification 11 (Specification *Page 805 
6 under the moral turpitude charge) charged that the appellant used public funds coming into her possession as clerk for her own private use or benefit during the years 1977 and 1978.
An information of impeachment and removal from office is not a criminal indictment, and the proceeding itself is neither exclusively civil nor criminal. Cf. State v. Hasty, supra.
Additionally, the legislature has described in Code of Ala. 1975, § 36-11-7 the allegations which must be contained in the information:
 Such information shall be addressed to the court before which the trial is to be had and shall specify, with reasonable certainty, the offense, offenses or other grounds of impeachment charged against the officer within the provisions of section 173 of article 7 of the Constitution and shall contain a succinct statement of the facts constituting the matters complained of and an appropriate prayer for process and relief. . . .
Tested by these considerations the allegations in the respective specifications sufficiently informed the appellant of those acts with which she was charged. Under the specifications of Charge Two on corruption, the jury had evidence upon which they could have found an "intent to defraud" entertained by the appellant. Whether or not it might have been better to have expressly characterized those acts as having been committed with that intent, the allegations were not fatal without it. The appellant's reference to Hasty, supra on that point is not well taken. That case does not mandate an allegation of "intent to defraud" under a charge of corruption. Hasty does requireevidence of that intent under such a charge.
Insofar as the charge of commission of offenses involving "moral turpitude," again we are convinced of the sufficiency of the allegations under the standards to which we have alluded above. The absence of a characterization of the acts as committed "wilfully" was not fatal to those specifications. The appellant's reference to Associated Industries of Alabama v. State,55 Ala. App. 277, 314 So.2d 879 (1975); cert. den. 294 Ala. 281,314 So.2d 901 (1975), is inapposite. There certain defendants had been convicted of violating the Corrupt Practices Law which made it an offense to "wilfully" fail or refuse to do certain acts required under that law. The Court of Criminal Appeals ruled that the indictment in that case was defective because it did not allege that the acts in question were "wilfully" done. As we have shown there is no requirement under the statute applicable here (commission of an offense involving moral turpitude while in office) that the acts made the basis of impeachment proceedings be "wilfully" done.
 C.
The appellant's final point concerns the admission of certain evidence offered by the State. The State had called as a witness the appellant's immediate predecessor, Murray Gibson. During his direct examination the following exchange occurred:
 Q Did you have occasions as the Clerk of the Circuit Court of Choctaw County, Alabama, to tell Mrs. Lewis, when she came into your employment, how the money must be handled in the Clerk's Office under your administration?
MR. GILMORE:
 Your Honor, we object to this line of questioning. It's just putting words in this witness' mouth. He is not letting the witness answer to any particular thing and tell what happened.
THE COURT:
Overruled.
A Would you state that again.
 Q I realize it's difficult. Did you have occasion to tell Mrs. Lewis how the money should and would be handled under the Laws of the State of Alabama in your administration?
 A. Yes. We sat down and discussed it. And normally we made about two deposits a week or sometime a deposit once a week, depending on how much work was available and so forth and so on. With one help handling all the cases, one person *Page 806 
doing it, you couldn't make it every day. The main thing I considered the most important thing —
MR. GILMORE:
Your Honor, we object to what he considers.
THE COURT:
Sustained.
Q Just tell us what you told her, Mr. Gibson.
A Liz told me she had just — when I asked her —
MR. GILMORE:
We object to this.
THE COURT:
Overruled.
Q You may answer, Mr. Gibson.
 A Elizabeth told me she had about Twenty-Five Hundred Dollars worth of her checks back there. I told Liz, let's go down to the bank and get the money right now, which I did. And I endorsed the note with her at the First National Bank.
Q What if anything did you tell her about doing this?
 A I just told her we couldn't do that and were not going to do it any more.
 Q As a matter of fact, as Clerk — did you know as Clerk of the Circuit Court of Choctaw County, Alabama, that using that money would be against the State Law?
MR. GILMORE:
We object.
THE COURT:
I sustain that.
 Q What did you tell Mrs. Lewis after she told you she had Twenty-Five Hundred Dollars in her personal checks back there in the bank?
 A We went down, back down and added them up to make sure of the total, which I don't exactly remember. She went down to the Bank, the First National Bank, and we borrowed the money and put the money back in that day.
 Q Had you ever given her permission as Clerk of the Circuit Court to take money out of that office and substitute her personal checks for it?
A No.
 Q Did you tell her after this happened never to let that occur again while you were the Clerk of the Circuit Court of Choctaw County?
MR. GILMORE:
We object.
THE COURT:
Come up here a minute, gentlemen.
. . . . .
 (THE FOLLOWING OCCURRED IN CHAMBERS, OUTSIDE THE PRESENCE OF THE JURY)
MR. UTSEY:
 We want to move for a mistrial, Your Honor, based on the Assistant Attorney General asking questions and eliciting testimony concerning a specific alleged act done by Mrs. Lewis prior to the time she took office. That is testimony to the effect, that while he was, Mr. Gibson was Circuit Clerk, that she had some Twenty-Five Hundred Dollars worth of checks in the cash box. And we feel that testimony is in no way relevant to the issues in this case, has nothing to do with the term of office this lady is now holding. And is so prejudicial that it cannot be eradicated from the minds of the Jury. And this case should be a mistrial at this point based on that.
THE COURT:
 I deny your motion. I make known that you have a right to renew at any time your objections, if this thing doesn't [dovetail in]. At this point in time, I deny your motion.
MR. UTSEY:
 Your Honor, we would also request and that the Court — if the Court will not grant a mistrial, to exclude that testimony from the Jury and give the Jury an instruction concerning the testimony concerning a specific incident involving Mrs. Lewis that occurred prior to the time she took office.
THE COURT:
 No, sir, I deny your motion on that. This was January, I think he said January. *Page 807 
MR. UTSEY:
 No, sir, said sometime during 1977. Couldn't remember when.
THE COURT:
 I think he said about January. This was shortly before. It's admissible in my opinion, if nothing more to show the duties and responsibilities of the Office. And I will deny your motion at this time. But you have been leading. Let's get away from that. That's the reason I mentioned —
MR. GILMORE:
We reserve exception.
 (THE FOLLOWING OCCURRED IN THE PRESENCE OF THE JURY)
(Continuing on Direct Examination)
BY MR. VALESKA:
 Mr. Gibson, after this incident occurred, y'all went down and got the money?
A Yes, sir.
 Q And replaced it. Did you, as the Circuit Court Clerk, put Mrs. Lewis on any type notice concerning these type transactions?
 A No, sir. You mean as far as putting her on notice, she was going to be fired if she did it again?
Q As to whether or not she could do it again?
A No, she knew she couldn't do it.
 Q She knew she couldn't do it. Thank you. Your witness.
The appellant maintains that the admission of the evidence concerning the appellant's check-cashing practices prior to her term in office was reversible error. We cannot agree. In the first place, the record reveals that no objection was made to the evidence when it was admitted. The objection was made too late, and no showing of surprise has been indicated. Baldwin v.McClendon, 292 Ala. 43, 288 So.2d 761 (1974). Moreover, the record reveals that only a general objection was made, albeit tardily. "It is generally recognized that a specific objection is a condition precedent to appellate review while a general objection is a waiver of appellate review." McElroy's AlabamaEvidence, § 426.01 (7) (3d ed. 1977).
The appellant argues further, however, that the admission of this prior act was prejudicial to reversal, having no relevance to the appellant's conduct of her office because it occurred prior to the time she assumed the position of circuit clerk.Parker v. State, supra, is cited in support of that argument. In Parker, however, the defendant was impeached for an act which occurred before he assumed his official position. Here the act admitted into evidence is not one for which the appellant was impeached but one which the State maintains bore upon the proof of her impeachable conduct while in office. In that connection the opinion of this Court in State v. Mathews, supra,259 Ala. at 140, 66 So.2d at 118, is pertinent:
 The acts of a respondent [being impeached] during a previous term may be considered as evidential facts, in so far as they are connected with or bear upon the respondent's general course of conduct during the second term, for the limited purpose of inquiring into the motive and intent of the respondent as to the acts and omissions charged to him during the second term, but an official cannot be removed because of his conduct during a previous term. . . .
There was a logical connection between the same kind of acts committed by the appellant before and after she became circuit clerk. The prior act of substituting her personal checks was relevant upon the charges and specifications to which that conduct was related, as bearing upon the appellant's motives and intentions in the performance of her official duties. Thus that evidence was admissible.
We also note that the appellant herself admitted on her direct examination that on occasion when Murray Gibson was clerk she had drawn money from the drawer and replaced it with checks to hold. A defendant cannot complain of the admission of improper evidence when he himself has testified to the same facts. Yelton v. State,294 Ala. 340, 317 So.2d 331 (1974); Ala. Dig. Crim. Law § 1169 (2). *Page 808 
The judgment is due to be and hereby is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.