446 So.2d 675 (1983)
Samuel Daniel CROSSLIN
v.
STATE.
8 Div. 533.
Court of Criminal Appeals of Alabama.
November 1, 1983.
Certiorari Denied March 2, 1984.
*676 William R. Hovater and John C. Martin for Martin & Ford, Tuscumbia, for appellant.
Charles A. Graddick, Atty. Gen. and Ed Carnes, Asst. Atty. Gen., and James F. Hampton and J. Anthony McLain, Sp. Asst. Attys. Gen., for appellee.
Alabama Supreme Court 83-197.

ON REHEARING
HARRIS, Judge.
The opinion released on July 5, 1983, is withdrawn and this is substituted therefor.
Appellant was indicted and convicted for the capital offense of murder in the first degree wherein two or more human beings are intentionally killed by one or a series of acts in violation of Alabama Code § 13A-5-31(a)(10) (Supp.1977). The victims in this case were appellant's niece, Bobbie Sue Morris, and her husband, Barry Glendon Morris. Appellant shot each of them twice *677 in the back of the head, execution style, with a .38 caliber Charter Arms Special. His punishment was fixed at death by electrocution. At arraignment, in the presence of counsel, appellant pleaded not guilty and not guilty by reason of insanity. Appellant is represented by court-appointed counsel on this appeal, as he was at trial, and has been furnished with a free transcript.
The facts surrounding this senseless crime proved without question that appellant and Dale Pounders drove to the victims' trailer some time around 3:00 a.m. on July 30, 1980, after visiting appellant's sister and nephew at the Colbert County Hospital. By telling the victims that his nephew in the hospital "was supposed to die," that "they needed to go and see him," appellant was able to gain entrance inside the victims' trailer. Once inside, appellant "pulled his revolver out" and ordered the victims to get on their stomachs. Appellant then tied the victims' hands behind their backs, unloaded the victims' .22 rifle and told them "he was going to take their pot." Then, after telling Pounders to "pull the coil wire" on the victims' Datsun pickup truck and after appellant had put a "big bag" of marijuana into his van, appellant led the victims to a brush pile behind their trailer where he summarily shot them.
By showing the detailed series of events which occurred just prior to the offense, during the res gestae of the offense and immediately after the offense, the State presented very strong evidence fully supportive of the jury verdict. Every element necessary to prove that appellant committed the capital offense was clearly established, including the element that the killings were intentional. The State presented convincing evidence that the slayings were calculated and were executed methodically. The precautionary steps taken by appellant prior to and during the commission of the crime suggest that appellant was well aware of what he was doing and intended the very consequences of his acts.
The State's evidence in this case proved conclusively the defendant's involvement in the murders of Barry Glendon Morris and Bobbie Sue Morris. The first witness called by the State was Dr. Joseph Embry, who was a doctor from the Department of Forensic Science, State of Alabama, who performed the autopsy on both bodies. His autopsy of July 30, 1980, established that each of the victims had been shot twice in the back of the head, producing large caliber bullet wounds. The bullets entered the back of the skull and penetrated the brain of each of the victims, Barry and Bobbie Sue Morris. These wounds caused the death of both of the victims. Dr. Embry testified that, in addition to similar bullet wounds in a similar position on both bodies, both bodies were found to have their hands tied behind their backs.
The State's next two witnesses were local law enforcement officers who were on duty on the night of July 29 and the morning of July 30, 1980. Mr. Harget testified that, on the night in question, he received two phone calls in regard to this matter. The first came from Cherokee Police Officer Bogas at approximately 3:53 a.m. on the date of July 30. He received a second call from a person whose voice he recognized as the defendant's at approximately 4:01 a.m. The defendant at this time indicated that there were three children in the trailer at the Morrises and that they needed to be taken care of. The caller would not identify himself. The next witness, Officer Bogas, testified that he received a call on the morning in question at the Cherokee Police Department. This caller indicated that there were three children inside the Morris trailer and that Morris and his wife were outside behind the trailer.
Colbert County Deputy Sheriff Dale Holley was dispatched to the Morris trailer on Highway 72 East. En route, he was followed by a Cherokee patrol car and he proceeded to the Morris trailer. Upon receiving no response at the door, the officers went inside the trailer to find only the sleeping children. A search of the area behind the trailer produced the bodies of Bobbie Sue and Barry Glendon Morris. They appeared to have been shot in the *678 back of the head; both had their hands tied behind their backs.
Mrs. Pamela Crosslin, wife of the defendant, was called to the stand by the State. She chose to invoke her privilege not to testify against her husband. At this point the State offered her prior testimony which was taken at the preliminary hearing of the defendant. This testimony was later admitted and read into the record at page 164 of the transcript.
Mickey Wayne Dison testified that, on the night of July 29 and morning of July 30, he had been at his motel room when the defendant came over. The defendant asked Dison to go to Cherokee to "rip off some pot." Dison indicated that he had to go to work the next day and would not go with him. Defendant then left but returned several hours later with a .38 pistol and a .22 rifle and a garbage bag full of marijuana. At the defendant's return to the motel room, Dison's girl friend left the room and went into the bathroom. With the defendant was one Dale Pounders. When they came into the room, the defendant threw some pot on the bed and said, "I did it, you didn't think I was losing my touch, did you? But, I didn't leave no witnesses." Upon being asked what he was talking about, the defendant stated, "I'm talking about I tied them up and laid them down and blew their fucking brains out." At this point Dison was asked to keep the guns there at his motel room for the defendant. Dison agreed to do so and received some marijuana for this favor. Dison testified that he woke up the next morning but did not go to work. He read about the murders in the newspaper. At that point, he called the defendant, asking him to pick up the guns. During the conversation, Cynthia Vaden asked the defendant if he shot them twice in the head and the defendant said he had.
Cynthia Vaden testified that she was with Dison in the motel room the night in question. Her testimony clearly supported that of Dison. She stated that while she was in the bathroom she watched and listened through the door to everything that was said. She verified that the defendant admitted to Dison and Pounders that he did it. This witness also indicated that Pounders told Dison that the defendant had in fact blown their heads off. Ms. Vaden also testified as Dison had that, after this second visit to the motel room, the defendant came back approximately 20 to 30 minutes later. At this point, the defendant expressed concern about the pistol and suggested that it be buried or thrown in the river. Both Vaden and Dison testified that the guns were returned to the defendant at a point in Florence, Alabama, on the following day.
The State's next five witnesses showed a clear chain of purchases and sales of the .38 Charter Arms pistol used to murder the Morrises. The testimony indicated clearly that the pistol was purchased at Barber's Appliance Store in Tuscumbia, Alabama, in June of 1979, then changed hands several times before being sold to the defendant some three months before the murder. This same pistol was shown to be the one used to cause the death of the Morrises.
Officer John Morse testified that he arrested the defendant in New Orleans, Louisiana, on August 4, 1980. At that time the defendant had in his possession a ring which was marked as State's Exhibit 23. This ring was later identified as one belonging to the deceased Barry Morris. There was testimony that the deceased Morris had this ring the night before his death.
Officer Ronnie May of the Colbert County Sheriff's Department testified that, on the day after the discovery of the bodies, the defendant had become a suspect. He, along with other officers, proceeded to the defendant's house, and upon their arrival the defendant stated that he knew what they wanted to talk to him about. At this point the defendant said, "It's about those niggers killing Bobbie Sue and Barry." A search was made of the defendant's house with his consent and later the defendant and Pounders consented to be fingerprinted, photographed, and have hair samples *679 removed for the investigation. Further testimony from officers indicated that a comb was found at the scene on the night that the bodies were discovered. This comb was later admitted to be Pounders'.
Dale Pounders testified as to the defendant's actions on the night in question, indicating that the defendant had been using drugs and was high that night. The defendant told this witness that he wanted him to go to Cherokee to get some pot. They proceeded to Cherokee in the defendant's van at which time the defendant indicated that he wanted to beat Bobbie up. On the way the defendant went to the back of the van and retrieved some electrical wire. He also cleared his .38 revolver, saying "he was going to get Barry." They went to the trailer of the Morrises, leaving the motor of the van running. Upon going in, the defendant and Pounders talked with the Morrises and the defendant found the Morrises' .22 rifle inside and emptied the shells from it. He pulled the revolver on them and told them to lie on their stomachs. At this point he tied both victims' hands behind their backs and instructed Dale to go pull the plug wires and coil wires out of the Morrises' truck parked outside. The defendant, with Pounders, led the two victims down behind the trailer in the brush 100 to 150 yards, made them lie down on the ground and told them to keep quiet. At this point the defendant waited some seconds and then held the .38 to the head of Barry Morris and shot him. He then shot Bobbie Sue Morris in the back of the head twice before shooting Barry Morris a second time. At this point Pounders asked the defendant, "Do you know what you have just done?" He said, "Yes, let's get the hell out of here." The two then ran back through the trailer, picked up the .22 rifle, and headed to the van. At this point they discovered that the van had run out of gas while idling outside. Pounders indicated that they obtained gas from the Morris truck and then left the scene. After stopping for gas the defendant decided to make phone calls to the Cherokee Police and the Colbert County Sheriff's Office. They proceeded to the Sheffield Motel and left the guns with Dison.
After this they went back to the defendant's house in Sheffield. Some minutes later the defendant left again and stayed away some 15 to 20 minutes. The day following this incident the defendant and Pounders decided to pack their gear and move to New Orleans. They were later arrested by the New Orleans Police Department on August 4, 1980. At this point the State rested. There were no motions made at the close of the case.
The defense's evidence in this case centered on the defense and plea of insanity. The testimony of the defendant's mother, a friend, and another relative all focused on the change of the defendant's behavior after he returned from military duty in Vietnam in approximately 1970. Some details of the defendant's unusual habits after Vietnam were discussed.
Dr. Lauren Gary, a general practitioner in Tuscumbia, Alabama, took the stand and testified that he had met with the defendant on two occasions and had administered tests. All this testimony was in support of the defendant's plea of not guilty by reason of insanity.
The defendant took the stand in this case and denied any memory of what had taken place on the night in question. His testimony tended to focus on his mental problems after returning from Vietnam and his recent difficulty with drugs. He testified that he was heavily "into drugs" during the time of the murder. He stated that he could not remember any of the details of going to the Morrises' trailer. He could only remember events just prior to and just after the trip to the trailer.
Appellant contends that the trial court erred in failing to sustain his objections to improper prosecutorial remarks made during the course of his trial. In light of the plain error rule, Rule 45A, ARAP, whether error in the trial proceedings is properly preserved for review is merely academic. Rule 45A reads as follows:
"In all cases in which the death penalty has been imposed, the Court of Criminal *680 Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant." (Emphasis added.)
At trial, during the cross-examination of appellant by the District Attorney, the following occurred:
"Q. Well, you drew one of them the day before or two days before you did the killing, didn't you?
"A. Those were back payments.
"MR. ROSSER (Defense Counsel): Judge, I will ask you to instruct Mr. District Attorneythis is the fifth time he has said, when you killed these people thus and so. That's improper question and he well knows it.
"MR. PATTON (District Attorney): There's nothing improper about it, he did kill them.
"BY THE COURT: Approach the bench, both of you.
"MR. ROSSER: He can't stay there and say that eitherhe did kill themand I object and ask for a mistrial.
"BY THE COURT: Overrule your objection. Approach the bench. (At this time the attorneys approached the bench.)"
Even though there is an abundance of evidence supporting the fact that appellant did kill the two victims, appellant never admitted to said allegations. Appellant only testified that he remembered nothing as to what happened the night of the killing while he was at the victims' trailer. Where the evidence affords a reasonable inference adverse to the innocence of the accused, a jury question is presented. Suggs v. State, 403 So.2d 309 (Ala.Cr. App.), cert. denied Ex parte Suggs, 403 So.2d 313 (Ala.1981). Truthfulness of testimony is for the triers of fact. Bozeman v. State, 401 So.2d 167 (Ala.Cr.App.), cert. denied Ex parte Bozeman, 401 So.2d 171 (Ala.1981). Furthermore, the law is clear that a prosecutor should never express his personal opinion as to the guilt of the accused as such expression invades the province of the jury. Mainor v. State, 339 So.2d 147, 150 (Ala.Cr.App.1976).
The emphatic remarks by the District Attorney in the presence of the jury that appellant did kill the two victims was improper comment which resulted in prejudicial error when the trial court failed to sustain defense counsel's objection and immediately admonish the jury to disregard said comments. When defense counsel either objects to improper comment or moves to have the remark excluded, it becomes the duty of the trial judge not only to sustain the motion or objection, but to also exercise a reasonable degree of effort to eradicate its effect from the minds of the jury. Collins v. State, 385 So.2d 993 (Ala. Cr.App.1979), reversed Ex parte Collins, 385 So.2d 1005 (Ala.1980).
We would further point out that, while a trial is not a parlor social affair, Arant v. State, 232 Ala. 275, 167 So. 540 (1936), side-bar remarks have no place in the trial of any case, especially where a man's life hangs in the balance, and should be studiously avoided by all parties. Edgeworth v. State, 54 Ala.App. 93, 304 So.2d 911 (1974). Considering other remarks made at trial, we do not find these remarks, standing alone, would require a reversal in this case, due to the fact that the trial court is in a better position to determine what effect, if any, certain occurrences may have had upon the jury's ability to decide appellant's fate fairly and justly. Washington v. State, 57 Ala.App. 465, 329 So.2d 155, 158 (1976). The prosecution is under a duty to prosecute with earnestness and vigorto strike hard blows, but not foul ones. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).
At the close of all the evidence, the trial court in its oral charge instructed the jury on murder, under Ala.Code § 13A-6-2(a)(1) (Supp.1977)[1], as being a lesser included *681 offense of Ala.Code § 13A-5-31(a)(10) (Supp.1977), but evidently did not find that the evidence merited an instruction on manslaughter. Thus, the jury could either have found appellant guilty of the capital offense under Ala.Code 13A-5-31(a)(10) (Supp.1977), or of murder under Ala.Code § 13A-6-2(a)(1) (Supp.1977), or the jury could have returned a not guilty verdict. Manslaughter, a crime not requiring a specific intent to kill, was not given to the jury as an alternative.
Evidence was presented at trial showing that around the time of the murders appellant "appeared to be high," and was "messed up," "pretty looped," and "kind of high." There was evidence that he had been drinking beer, smoking pot, and taking Placidyl and "one or two Quaaludes." Appellant testified in his own behalf that he had been "into drugs pretty heavy" for several days preceding the killings and that he had absolutely no recollection about anything that might have happened at the victims' trailer. He denied remembering anything about the killings.
Based on the foregoing circumstances, appellant contends that the trial court committed reversible error in refusing to charge the jury on the lesser included offense of manslaughter.
Appellant's basic argument in support of his contention that a manslaughter instruction should have been given is that he was so intoxicated at the time of the commission of the offense that a jury question was presented as to whether he was capable of forming the specific intent necessary for conviction under Ala.Code § 13A-5-31(a)(10) (Supp.1977) or § 13A-6-2(a)(1) (Supp.1977). The only portion of the trial court's oral charge which deals with intoxication reads as follows:
"Intoxication, other than involuntary intoxication, is not a defense to a criminal charge, but may be considered by the jury if relevant on the question of whether the fact of intoxication negates an element of the offense charged, such as intent, but not the element of recklessness."
As can be seen, this charge is completely silent on what course the jury should pursue if they were to find that appellant was intoxicated to such degree he was incapable of forming the specific intent necessary for the commission of the capital offense of murder.
Relying on that line of authority which holds that drunkenness may reduce murder to manslaughter where there is evidence of drunkenness to such degree that the accused is incapable of rational action and, hence, incapable of forming a specific intent essential to the higher offense, appellant contends that the trial court should have coupled its charge on the effects of intoxication with a charge on manslaughter. There has been uniform acceptance of the following statement as to effects of voluntary intoxication:
"Voluntary drunkenness neither excuses or palliates crime. But in murder cases evidence of drunkenness of such degree that the accused is incapable of rational action and hence incapable of forming a specific intent essential to a malicious killing may reduce the killing to manslaughter, or may negate the premeditation and deliberation essential to murder in the first degree, or reduce the crime to murder in the second degree." (Emphasis added.) Ray v. State, 257 Ala. 418, 59 So.2d 582, 584 (1952); Helms v. State, 254 Ala. 14, 47 So.2d 276, 281 (1950); Ivory v. State, 237 Ala. 344, 186 So. 460 (1939); King v. State, 90 Ala. 612, 616, 8 So. 856 (1891); Stockard v. State, 391 So.2d 1049 (Ala.Cr.App.1979), rev'd on other grounds, 391 So.2d 1060 (Ala.1980)
It is true that the degree of intoxication necessary to negate specific intent and, thus, reduce the grade of an offense must amount to "insanity." Maddox v. State, 31 Ala.App. 332, 334, 17 So.2d *682 283, 285 (1944). Mere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act. Gautney v. State, 284 Ala. 82, 222 So.2d 175 (1969); Walker v. State, 91 Ala. 76, 9 So. 87 (1891). Partial intoxication will not avail to disprove the specific intent; the intoxication must be of such character and extent as to render the accused incapable of discriminating between right and wrongstupefaction of the reasoning faculty. Green v. State, 342 So.2d 419 (Ala.Cr.App.1977).
However, it is equally clear that the degree of intoxication exhibited by an accused, such as to reduce murder to manslaughter, even where the evidence is in sharp conflict, is for the jury to decide. Helms, supra; Chatham v. State, 92 Ala. 47, 9 So. 607 (1891); Maddox, supra. In Chatham, supra, a larceny case where there was some testimony that the accused was drunk at the time of the commission of the offense, and in which the accused testified "he did not remember anything which occurred," the Supreme Court wrote the following:
"When the offense consists of an act committed with a particular intent, when a specific intent is of the essence of the crime,drunkenness, as affecting the mental state and condition of the accused, becomes a proper subject to be considered by the jury in deciding the question of intent.... `Although drunkenness, in point of law, constitutes no excuse or justification for crime, still, when the nature and essence of a crime is made by law to depend upon the peculiar state and condition of the criminal's mind at the time, and with reference to the act done, drunkenness, as a matter of fact, affecting such state and condition of the mind, is a proper subject for consideration and inquiry by the jury. The question in such cases is, what is the mental status?' The decided weight of authority sustains the doctrine that evidence of the condition of the accused, though caused by voluntary drunkenness, is receivable, and may be considered by the jury in determining the question of intent. (Citations omitted.) Charges as to this doctrine should, when necessary, be accompanied by such explanatory instructions as will prevent its misapplication by juries.... There being some testimony tending to show that defendant was drunk, he had a right to have the jury pass upon its credibility and sufficiency to prove that he was so drunk as to be incapable of forming the specific intent to steal...." (Emphasis added.) 9 So., at 607, 608.
The standard to be applied in this state is that in a capital case the jury must be instructed on each lesser-included offense which has "any basis in the evidence." Beck v. State, 396 So.2d 645 at 658 (Ala.1980); Ex parte Kyzer, 399 So.2d 330 (Ala.1981). A lesser-included offense instruction should be given if "there is any reasonable theory from the evidence which would support the position." Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982); Chavers v. State, 361 So.2d 1106 (1978); Fulghum v. State, 291 Ala. 71, 75, 277 So.2d 886, 890 (1973). Our decisions are to the effect that "Every prisoner at the bar is entitled to have charges given, which, without being misleading, correctly stated the law of his case, and are supported by any evidence, however weak, insufficient, or doubtful in credibility." (Emphasis added.) Gibson v. State, 89 Ala. 121, 8 So. 98 (1889). See also Burns v. State, 229 Ala. 68, 155 So. 561 (1934).
No matter how strongly the facts may suggest that appellant was not so intoxicated at the time he committed the offense that he was incapable of forming the necessary specific intent, the jury should have been instructed on manslaughter as a lesser included offense since there was a "reasonable theory from the evidence which would support the position."
During cross-examination of State witnesses Cynthia Vaden and Karen Foster, *683 appellant requested certain written statements these two witnesses had given to the prosecution concerning their respective knowledge about the case. Both of these witnesses saw appellant and Pounders at Mickey Dison's room at the Alabama Motel in Sheffield shortly before 4:00 on the morning of the killings, and Ms. Vaden, in particular, heard appellant confess to the crime on that occasion.
Ms. Vaden and Ms. Foster both admitted that they had given written statements to the police about the case. Ms. Vaden, on cross-examination, testified that her present testimony was "word for word" the same as her prior written statement. Ms. Foster, on the other hand, testified that she could not remember if her prior written statement contained anything in addition to her present testimony. "Well, there is a lot of things that I'm not sure about, but it's mostly the same." Appellant made it clear at the time he made the request that he wanted the statements to compare them with each witness's present testimony, to see if the present testimony "is any different." The trial court denied appellant's request to see the prior statements on the basis the statements were the "work product of the prosecution."
The Supreme Court of this State, in Ex parte Pate, 415 So.2d 1140 (Ala.1981), reviewed the question "whether or when the defendant in a criminal case is entitled to inspection of a statement of a prosecution witness for the purpose of cross-examination or impeaching the witness." This case held the following:
"[W]here a prosecution witness had testified on direct examination in the trial of the case, ... defendant, upon laying a proper predicate, is entitled to have the Court, at least, conduct an in camera inspection as outlined in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). The trial court could determine initially (1) whether the statement made by the witness before the trial differed in any respect from statements made to the jury during trial, and (2) whether the statement requested was of such nature that without it the defendant's trial would be fundamentally unfair."
We believe that a proper predicate was established by appellant in this case for the trial court to have conducted an in camera inspection of the witnesses' prior written statements in the manner set out above.
Appellant's wife, Pamela Crosslin, when called as a State witness, asserted her spousal privilege not to testify against her husband and did not testify against him at trial. Undaunted by the exercise of this privilege, the State then proceeded to introduce a transcript of Mrs. Crosslin's former testimony at appellant's preliminary hearing. The transcript was admitted over objection and subsequently was read into evidence. Appellant contends this was error. Appellant maintains that the transcript of his wife's former testimony exposed certain confidential communications he had with her which were his privilege to not have revealed, despite any rules otherwise allowing for the admission of her former testimony.
Clearly, appellant's wife was entitled to assert her privilege not to testify at appellant's trial. Arnold v. State, 353 So.2d 524 (Ala.1977). "The husband and wife may testify either for or against each other in criminal cases, but shall not be compelled so to do." (Emphasis added.) Ala.Code § 12-21-227 (1975). And, where a witness avails himself or herself of a privilege not to testify, that witness's testimony in a former proceeding may be admissible in a subsequent proceeding where the former testimony was given under oath, the issues in the subsequent proceeding are substantially the same as in the former proceeding, and the party against whom the former testimony is offered was given an opportunity to cross-examine the witness during the former proceeding. C. Gamble, McElroy's Alabama Evidence §§ 245.07(5), (6), (8) and (10) (3rd ed. 1977); Wyatt v. State, 35 Ala.App. 147, 46 So.2d 837, cert. denied, 254 Ala. 74, 46 So.2d 847 (1950).
*684 Mrs. Crosslin's testimony at appellant's preliminary hearing met all of the above requirements. Thus, it can be seen that the pure assertion of one's privilege not to testify against his or her spouse is not sufficient, in and of itself, to prevent former testimony from being introduced against one's spouse at a subsequent proceeding.
Be that as it may, the statutory rule discussed above in no way alters or diminishes the common law privilege which protects the communicating spouse from having confidential communications disclosed. Arnold, supra; McCoy v. State, 221 Ala. 466, 129 So. 21 (1930). "The privilege for confidential communications ... belongs to the communicating spouse, and he or she may prevent the other spouse from testifying to any conversation or action performed in the privacy of the marriage." Arnold, 353 So. at 526; Cooper v. Mann, 273 Ala. 620, 143 So.2d 637 (1962).
Appellant cites four statements from the transcript of Mrs. Crosslin's testimony at appellant's preliminary hearing which he claims were wrongfully disclosed at trial. Appellant claims that said statements were intended as confidential communications by him to his wife, and hence, were privileged.
However, upon review of the supplemented record, we find that even if said communications were privileged, no reversible error resulted in the introduction of said testimony due to the fact that appellant testified himself to these very statements later in the trial. As stated in Lewis v. State, ex rel. Evans, 387 So.2d 795 (Ala. 1980), a defendant cannot complain of the admission of improper evidence when he himself has testified to the same facts. Wyrick v. State, 409 So.2d 969 (Ala.Cr. App.1981); Ala.Dig.Crim.Law § 1169(2).
As much as we regret the result of this case on appeal, the worst wretch that walks the earth is entitled to a fair trial. Watts v. State, 282 Ala. 245, 210 So.2d 805 (1968); Commander v. State, 374 So.2d 910 (Ala.Cr.App.1978); writ quashed, 374 So.2d 921 (Ala.1979). Because of the errors committed in the trial court, appellant has been denied a fair trial. Of necessity, therefore, the judgment of conviction must be reversed and the cause remanded.
Application for Rehearing Overruled.
REVERSED AND REMANDED.
BOWEN, P.J., and TYSON, J., concur in the result only.
HUBERT TAYLOR, J., dissents with opinion which SAM W. TAYLOR, J., joins.
HUBERT TAYLOR, Judge, dissenting.
The remarks of the prosecutor were within the scope of the evidence presented, i.e., a senseless, cold blooded murder.
No evidence was presented that would justify a charge on manslaughter. The facts show human nature in its darkest form. There can be only one result to this type conductthe one reached by the jury and trial court.
NOTES
[1] Since the crime in this case occurred in 1980, the trial court properly considered only those crimes found in the new criminal code, which were in effect then, as lesser included offenses to the capital crime sub judice, and correctly did not charge the jury on first and second degree murder as lesser included offenses.