781 So.2d 330 (2000)
Ex parte Casey A. McWHORTER.
(In re Casey A. McWhorter v. State).
1990427.
Supreme Court of Alabama.
August 11, 2000.
Rehearing Denied October 27, 2000.
*332 Randall S. Susskind, Equal Justice Initiative of Alabama, Montgomery; James R. Berry, Albertville; and Thomas E. Mitchell, Albertville, for petitioner.
Bill Pryor, atty. gen., and Thomas F. Parker IV, asst. atty. gen., for respondent.
LYONS, Justice.
Casey McWhorter was convicted of capital murder for the death of Edward Lee Williams; he was convicted under § 13A-5-40(a)(2), Ala.Code 1975murder committed during the course of a robbery in the first degree. By a vote of 10-2, the jury recommended that McWhorter be sentenced to death. The trial court followed the jury's recommendation and sentenced McWhorter to death by electrocution. In a unanimous decision, the Court of Criminal Appeals affirmed McWhorter's conviction and sentence. McWhorter v. State, 781 So.2d 257 (Ala.Crim.App.1999). We granted certiorari review, pursuant to Rule 39(c), Ala.R.App.P.[1] We affirm the judgment of the Court of Criminal Appeals.
McWhorter has raised 29 issues for our review. The Court of Criminal Appeals fully addressed and correctly resolved each of these issues in its thorough and well-researched opinion. Only two issues warrant further discussion; both of them *333 were specifically addressed at oral argument.

I. Facts

The trial court's sentencing order included the following detailed statement of the facts of the case:
"The court finds beyond a reasonable doubt that approximately three weeks before February 18, 1993, the 18-yearold defendant conspired with 15 and 16 year old codefendants (the 15-year-old codefendant being the son of the victim) to kill the victim in order to rob him of a substantial sum of money and to obtain other property from his home. This conspiracy was discussed from time to time until February 18, 1993. On that date a fourth party, who was aware of the plot, dropped the defendant and the 16-year-old codefendant off on a highway a few blocks from the victim's home at about 3:00 p.m. The fourth party and the 15-year-old son of the victim rode around until they met the defendant and the other codefendant at a pre-arranged spot at 8:00 o'clock that evening.
"The defendant and the 16-year-old proceeded on foot to the victim's home and let themselves in the unlocked empty house. They knew that the victim was not expected home for approximately three to four hours. They spent this three- to four-hour period of time in the home going through it, gathering up various items that they wanted to keep and making silencers for two .22 rifles which were there in the home. One silencer was made out of a plastic jug and filled with napkins and attached to the rifle by duct tape. The other was made by wrapping a pillow around the barrel of the second rifle and holding it in place with duct tape and electrical wire. The rifles were `test-fired' into a mattress to see if the silencers were accomplishing the desired effect. When the victim arrived home, he first saw the 16-year-old, grabbed the rifle he was holding and began to struggle over it. At that point, the defendant fired the first shot into the victim's body. Between the two conspirators on the scene, the victim was shot at least 11 times. After the victim was down on the floor, the defendant fired at least one more round into his head to assure that he was dead. They took his wallet and various other items from the home and left in the victim's pickup truck. They met the other two parties at the prearranged spot, took the victim's truck out into the woods and stripped it. The spoils were divided between the four individuals. The toxicologist testified that the victim died of multiple gunshot wounds, there being 11 entrance wounds and 2 exit wounds. The aorta and another major blood vessel were pierced, causing approximately half a gallon of blood to accumulate in the chest cavity and at least one bullet was removed from the brain.
"The defendant's guilt was evidenced not only by his confession but by the testimony of the fourth party who drove the defendant to the area near the victim's home and met him again at 8:00 p.m. and by the testimony of a friend to whose home the defendant carried part of the spoils and to whom the defendant confessed the substance of his guilt. All of the physical evidence was consistent with the above account."
R. 386-88.

II. Lesser-Included-Offense Instructions

McWhorter argues that he presented evidence indicating he was intoxicated at the time of the killing, that the trial court instructed the jury that evidence of voluntary intoxication can support a finding of a *334 lack of the intent necessary to a finding of capital murder, and that the trial court therefore erred in refusing to instruct the jury on manslaughter, felony murder, and "intentional murder" as lesser included offenses. This case raises the question of the quantum of proof sufficient to warrant a lesser-included-offense instruction based on the possibility that the jury may not find the intent necessary for a conviction of capital murder. McWhorter argues that the jury could have inferred from the evidence presented at trial that he was unable to form the intent to commit murder because, he says, he was extremely intoxicated at the time of the crime.
The evidence shows that McWhorter and his accomplices carefully planned and carried out the crime. McWhorter and Daniel Minor lay in wait for hours at the victim's home and, while waiting, manufactured and tested homemade silencers to use on weapons found in the victim's home. When the victim arrived home, McWhorter and Minor used these weapons to commit the killing. Then they gathered some of the victim's belongings, loaded them into the victim's pickup truck, and drove the truck to a previously agreed upon meeting place. There, they divided the property stolen from the victim. McWhorter took his portion of the weapons and the victim's other property and hid that property and the weapons at the home of a friend.
On February 19, 1993, the day after the crime, McWhorter gave a voluntary unsworn statement to Detective James Maze of the Albertville Police Department. Because McWhorter's claim that he was entitled to a charge on a lesser included offense is premised on his claim that at the time of the killing he was not aware of what he was doing, we quote his statement in its entirety:
"Maze: This is February 19, 1993. It's now 11:40 a.m. Interview with Casey Allen McWhorter. And you're 18 years old? 19?
"McWhorter: 18.
"Maze: What's your date of birth?
"McWhorter: 11-11-74.
"Maze: 11-11-74. Now, just a moment ago, I advised you of the Miranda warning and your rights, and you understand that. Is that correct, Casey?
"McWhorter: Yes, sir.
"Maze: They do call you Casey?
"McWhorter: Uh huh.
"Maze: And you're waivering [sic] your rights at this time? Yes or no?
"McWhorter: Yes.
"Maze: Okay. All right. Now what we're gonna be talking about is Edward, Mr. Edward Williams that lives [sic] at 1202 Hyatt Street here in Albertville. Do you know him?
"McWhorter: No, personally, no, I don't.
"Maze: Okay. Do you want to tell me what happened last night after 6:15, between 6:30 and 8 o'clock?
"McWhorter: I don't know nothing about him. I really don't.
"Maze: Was you over at his house?
"McWhorter: Not that I know of.
"Maze: All right. Yesterday evening, who was you with?
"McWhorter: I was by myself. I was at Carry's house.
"Maze: At whose house?
"McWhorter: Carry's.
"Maze: Carry who?
"McWhorter: Barnes.
"Maze: Carry Barnes?
"McWhorter: Uh-huh.
"Maze: Is that the woman's name?
"McWhorter: (Not audible)
"Maze: Who was with you?

*335 "McWhorter: Just me. I was in the back room by myself thinking about everything.
"Maze: In what respect, what was you thinking about?
"McWhorter: My last girlfriend.
"Maze: Who was your last girlfriend?
"McWhorter: Tiffany.
"Maze: Tiffany who?
"McWhorter: Harper.
"Maze: Where does she live at?
"McWhorter: Ah, she just moved, and I ain't exactly sure where she lives.
"Maze: What's her parents' name?
"McWhorter: I don't know that.
"Maze: Does she work anywhere?
"McWhorter: Uh uh.
"Maze: Does she go to school?
"McWhorter: Uh huh.
"Maze: Which school does she go to?
"McWhorter: She goes to Albertville High School.
"Maze: Tiffany Harper. When's the last time you seen Tiffany?
"McWhorter: It's been, ah, a pretty good while.
"Maze: Okay, what time did you get up yesterday morning up at [the] Barneses'? That'd be we're talking about Thursday morning now.
"McWhorter: Ah, I got up, I guess, at about twelve or one.
"Maze: Around noon?
"McWhorter: Twelve or one o'clock, something like that.
"Maze: All right, who was there when you got up?
"McWhorter: There wasn't nobody there when I got up.
"Maze: When did you last see Abraham [Barnes] that day?
"McWhorter: That morning.
"Maze: Approximately what time?
"McWhorter: When he was leaving for school.
"Maze: All right, Tommy, do you have anything? Also present is Chief Investigator Tommy Cole.
"[Pause]
"Maze: Okay, is there anything else that you want to say over on [sic] before we conclude here?
"McWhorter: Lee and Daniel, they called me on the telephone and told me they was gonna go to his house, to Lee's dad's house, and they was gonna take everything out of it and they asked me if I wanted to go and I said `I don't know' and then they convinced me into going and so
"Maze: This was on Wednesday evening?
"McWhorter: So I got drunk Thursday.
"Maze: Y'all were on a three-way telephone conversation, Lee was at his house, you was at your house, and Daniel was at his house. Is that correct?
"McWhorter: Yes, sir.
"Maze: Okay.
"McWhorter: And then I got pretty much drunk and we went and did all this. I don't remember being at the house, I really don't, this I promise to God, I don't.
"Maze: Okay, was it just you and Daniel in the house?
"McWhorter: Yeah.
"Maze: Just you and Daniel?
"McWhorter: Just me and Daniel.
"Maze: Okay, which one of you done the shooting, firing of the weapon?
"McWhorter: I think Daniel did, to be absolutely honest with you.
"Maze: Okay, who made the silencers to go around the pillow [sic]?

*336 "McWhorter: I did.
"Maze: You did that?
"McWhorter: Yeah.
"Maze: For both guns?
"McWhorter: Cause I told him Wednesday night how to do it.
"Maze: Okay.
"McWhorter: He told me to do that, so I did that.
"Maze: Okay, did y'all take any money off him?
"McWhorter: Uh uh. I did not take any money off him. Now, Daniel and Lee might've gotten money cause
"Maze: Was Lee in the house?
"McWhorter: Uh uh. Daniel got his checkbook and it had all his credit cards and stuff in it.
"Maze: Okay.
"Cole: Did anything happen to one of the guns at the time that the shooting was going on to make itdid anything happen?
"McWhorter: I don't know.
"Maze: Like misfire, jamming?
"McWhorter: I couldn't tell you.
"Maze: Okay, so you think, to the best of your knowledge, that Daniel done all the firing?
"McWhorter: Yes, sir.
"Maze: You could have, but you don't remember it?
"McWhorter: I could have, but I, I don't recollect cause I, I was drunk.
"Maze: Okay, y'all was waiting at the house on, ah, Mr. Williams to come home. Is that correct?
"McWhorter: Yes.
"Maze: You and Daniel was in the house when he came home?
"McWhorter: Cause Lee had asked us to
"Maze: Had asked y'all to, ah, rob him and, ah
"McWhorter: Yes, sir.
"Maze: Murder him?
"McWhorter: Yes, sir.
"Maze: Okay, what did you do with the.22 rifles you left, ah, with
"McWhorter: Mark [Marcus] Carter has some of `em.
"Maze: What's Mark got?
"McWhorter: He's got a .410, he's got a 12 gauge sawed-off which was mine, anyway it wasn't taken from the house, and he's got another .22.
"Maze: Rifles or pistols?
"McWhorter: Rifles.
"Maze: Okay, what'd you do with the .22 rifle that you carried to the Barneses' or up thataway?
"McWhorter: I don't remember what happened to it.
"Maze: Did you throw it in the creek or did you hide it around the Barneses' house?
"McWhorter: I don't really remember.
"Cole: Now, son, we need to get to the bottom of this.
"McWhorter: If I can remember what I did with it, I'll tell you, I promise. I just got to get it all to come back.
"Cole: Okay.
"McWhorter: As soon as I remember, I'll tell you.
"Maze: What all else did y'all take out of the house that you can remember? Did you take some CDs?
"McWhorter: Yeah.
"Maze: How about some orange boxes?
"McWhorter: Daniel's got all the CDs. He's got the orange boxes too.
"Maze: What one of the silencers what'd you use to make one of the silencers to go over the gunwhat'd you use to make that with?

*337 "McWhorter: Pillow.
"Maze: Wrapped in how?
"McWhorter: Duct tape.
"Maze: Gray duct tape?
"McWhorter: Yeah.
"Maze: Where's that at, do you know?
"McWhorter: Uh uh.
"Maze: All right, what did you use to make the other one?
"McWhorter: Milk jug.
"Maze: What was in the milk jug?
"McWhorter: Napkins.
"Maze: Okay, how did you fix it to the barrel of the gun?
"McWhorter: Duct tape.
"Maze: Okay, do you know where that jug's at?
"McWhorter: No, sir, I sure don't.
"Maze: Okay.
"McWhorter: The last I seen it, it was at Daniel's house.
"Maze: And after you and Daniel went to the house and, ah, took the stuff, the guns and checkbook and stuff, and shot Mr. Williams, y'all met Lee, his son, and another boy at, ah, a Carter boy at, ah, Albertville High School?
"McWhorter: Yes.
"Maze: Then what did y'all do, went and ditched the truck, yes or no?
"McWhorter: Yes.
"Maze: Okay, then what happened?
"Cole: Did you take anything out of the truck?
"McWhorter: We got, it was all the stuff out of the back of the truck.
"Cole: Did you take any items from the truck itself, anything like the stereo from the truck?
"McWhorter: Yeah, we got the stereo out of it.
"Cole: What happened to it?
"McWhorter: I'm not real sure. I put it in, ah, the floorboard of Mark's car.
"Maze: Okay, where did Mark let you out at?
"McWhorter: He brought me back up to Carry's, but he didn't go all the way to the house.
"Maze: He let you out down there between the bridges?
"Cole: You walked up the hill?
"McWhorter: Yeah.
"Maze: Is there anything else that you can remember about the shooting and robbery of Mr. Williams?
"McWhorter: No.
"Maze: Did, ah, Lee, his son, say why he wanted y'all to do this?
"McWhorter: He just said that he was a bastard and, ah, couple of other choice words.
"Maze: Did he at any time say that if y'all didn't do it there at the house that y'all better pop him while he was coming down the road?
"McWhorter: Naw, he said shoot him when he comes in the door, he'll shoot you.
"Maze: Okay.
"McWhorter: And he said he was gonna give us money to do it.
"Maze: Is there anything else, Casey, that you want to say about this?
"McWhorter: No, sir.
"Cole: At any time did you ever tell Lee Williams that his daddy didn't have as much money on him as he said he did or said he would have?
"McWhorter: Lee said that he's got money on him at all times and Lee said for us to take that for doing it, and I said that he didn't have no money on him at all when I seen him later.
"Maze: Is there anything else?

*338 "McWhorter: No.
"Maze: This concludes the interview at 7:57 [sic; 11:57?].
"[Pause]
"Maze: Okay, we just went off there. I thought we was done, but Casey remembered some other information. Would you go over that again about y'all standing there and each one of you had a gun with a silencer on it when Mr. Williams come in?
"McWhorter: I had the old .22. I don't know exactly how old it is, but it's older than the one Daniel had.
"Maze: That's the one that's tube fed.
"McWhorter: Yeah.
"Maze: And one of `em had the clip?
"McWhorter: Daniel had the one with the clip.
"Maze: Okay.
"McWhorter: And then he come back there, he grabbed the gun, the end of Daniel's gun.
"Maze: That's Mr. Williams grabbed the end of Daniel's gun in the hallway there beside the ladder?
"McWhorter: Uh huh.
"McWhorter: And then I was sitting there watching him and then he turned around and looked at me.
"Maze: Where were you sitting?
"McWhorter: Just right, the ladder was here, and I was right here.
"Maze: Behind him?
"McWhorter: Yeah, on in this other room with the door open.
"Maze: In the living room part?
"McWhorter: No, it was in the back.
"Maze: Right straight across from the bathroom or right?
"McWhorter: Behind the bath.
"Cole: Where there was an aluminum ladder sitting in this little hallway?
"McWhorter: I was in the room right behind that.
"Maze: Okay, where there was a bed and some clothes in there?
"McWhorter: Yeah.
"Maze: In there where y'all tested, fired the guns into the mattress?
"McWhorter: Yeah.
"Maze: That's where you were sitting?
"McWhorter: Yeah, and as he grabbed Daniel's gun he was gonna turn around, and I shot him in the leg, and he started screaming, and then I pulled the trigger again and it didn't work then. Then I just heard all sorts of firing, and that's pretty much it.
"Maze: Okay, is there anything else that you might think of before we go off again?
"McWhorter: Not that I recall.
"Maze: Okay, this concludes the interview at 12 noon."
McWhorter's statement is riddled with internal inconsistencies. While at the outset McWhorter claims a lack of memory, on account of intoxication, and even denies being at the victim's house on the night of the crime, he then furnishes detailed information about how the crime was committed. In his statement, McWhorter admitted that he had made the silencers for the two guns, and he was able to describe in detail what he used to make the silencers. When asked who fired the guns, McWhorter stated that he could not recall who fired the guns because he was drunk, but then was able to recall exactly what kind of guns they took from the victim's home. McWhorter also stated that he shot the victim in the leg. He knew which gun he held while he and Minor were waiting for the victim to arrive home, and he described in detail the sequence of events that transpired when the victim entered *339 his home. He remembered test-firing the guns, dividing and disposing of the victim's property, removing the stereo from the victim's truck, and where Marcus Carter dropped him off after the crime. His action on the night of the crime is wholly inconsistent with his self-serving statements suggesting he had a diminished capacity.
McWhorter argues that he was extremely intoxicated before, during, and after the crime. At the preliminary hearing, Detective Maze testified that Abraham Barnes had told him that McWhorter had tried to commit suicide the night after the killing by taking some pills and drinking some alcohol. According to Barnes, McWhorter had been taken to a hospital several hours after the killing, after, Barnes said, he had attempted to commit suicide by ingesting pills and alcohol. However, other than his statement, McWhorter does not point to any evidence indicating he was intoxicated at the time of the commission of the crime. Carter, who drove Minor and McWhorter to the victim's house and who met them later in the evening, testified that he saw no indication that McWhorter had been drinking alcohol either before or after the crime and that McWhorter was not intoxicated on that night. Carter testified that, after the crime, when he met Minor and McWhorter at the designated place, McWhorter did not appear to have been drinking. McWhorter's statements to others on the night of the crime indicate that he was aware of his actions. Barnes testified that, on the night of the crime, McWhorter told him that he unloaded a clip into the victim and that he and Minor stole the victim's truck. Detective Maze testified that at noon the next day, when the statement was given, McWhorter did not appear to be under the influence of drugs or alcohol, even though McWhorter said he had been admitted to a hospital for an alcohol and drug overdose. No evidence in the record establishes when McWhorter ingested the alcohol that led to his hospitalization.
The only evidence indicating McWhorter was intoxicated was McWhorter's own statement to the police. The trial court found that evidence insufficient to warrant giving instructions on lesser included offenses.

III. Manslaughter

McWhorter argues that the trial court erred in refusing to give a manslaughter instruction. An instruction on manslaughter would have been incompatible with McWhorter's defense. At trial, McWhorter did not argue that he was under the influence of alcohol or drugs at the time of the crime, and he did not request a voluntary-manslaughter instruction. Had an instruction been requested that would have conflicted with defense strategy, there is no error in the trial court's failure to give the instruction. Bush v. State, 695 So.2d 70, 113 (Ala.Crim. App.1995). See, also, Sockwell v. State, 675 So.2d 4, 25 (Ala.Crim.App.1993); Gurley v. State, 639 So.2d 557 (Ala.Crim.App. 1993). The Court of Criminal Appeals concluded that the trial court correctly refused to give the charge because, it concluded, the evidence suggested no reasonable theory that would support a manslaughter charge.[2]

IV. Felony Murder and Intentional Murder

McWhorter also argues that the trial court should have charged the jury on *340 felony murder and intentional murder. He makes a two-pronged argument. First, he contends that the evidence supports a felony-murder theory because, he argues, he was a teenager and a jury could have reasonably concluded that, even if there was discussion of killing, he did not seriously believe that the victim would be killed. He argues that his statement supports the theory that Minor killed the victim and that McWhorter was only an accomplice. McWhorter argues that he has presented evidence that supports a felony-murder theory. He states that he intended only to rob the victim, not to kill him, and that he never thought the victim would be killed. Second, he contends that his evidence of intoxication justified a charge on the lesser included offenses of felony murder and intentional murder.

A. Entitlement to an Instruction Based upon Evidence Having to do with Matters other than Intoxication
Putting to one side for the moment the issue of intoxication, we see no reasonable theory that would have supported a charge on felony murder. The evidence showed that Casey McWhorter, Lee Williams, and Daniel Minor carefully planned and carried out the crime. They had planned the crime at least three weeks before they carried it out. In addition, McWhorter and Minor lay in wait for hours at the victim's house and made silencers for the weapons while they waited for him to arrive home.
In addition, again putting to one side for the moment the issue of intoxication, we see no reasonable theory that would support a charge on the lesser included offense of intentional murder. As the Court of Criminal Appeals held, the evidence would support no theory on which the jury could have found an intentional murder but not a robbery. That court noted that McWhorter made no argument as to why the trial court should have charged the jury on intentional murder. Lee Williams had told McWhorter that the victim would have cashed his paycheck that day and therefore would have a large sum of money on his person and that, if McWhorter would kill him, McWhorter could have the money. In his statement, McWhorter said that Lee Williams told him that his father kept money on him at all times and that McWhorter and Minor could take the money for killing his father.
In Ex parte Myers, 699 So.2d 1285, 1290-91 (Ala.1997), the defendant argued that the trial court erred in not instructing the jury on the lesser included offense of felony murder because, he argued, the evidence showed that he intended to rob, not to kill, the victim. This Court held that the defendant was not entitled to a felony-murder instruction because he did not present any evidence indicating that he did not intend to kill the victim. Similarly, McWhorter presented no evidence indicating that he did not intend to kill the victim. In fact, there was testimony indicating that McWhorter had agreed to kill the victim in exchange for any money the victim would have on his person that night. The evidence shows that McWhorter intentionally and consciously planned to rob and murder the victim. Therefore, McWhorter was not entitled to an instruction on felony murder, and the trial court did not err in refusing to give such an instruction, unless to refuse it was error in light of the issue of intoxication.

B. Entitlement to an Instruction Based upon Evidence of Intoxication
While voluntary intoxication is not a defense to a criminal charge, it can negate the specific intent necessary for an intentional murder, reducing the offense to manslaughter. McConnico v. State, 551 So.2d 424 (Ala.Crim.App.1988). Relying on Owen v. State, 611 So.2d 1126 (Ala. *341 Crim.App.1992), for the proposition that a trial court commits reversible error by failing to instruct a jury on intoxication, McWhorter argues that if the crime involves specific intent and any evidence presented at trial indicates that the defendant was intoxicated at the time of the crime, then the defendant is entitled to have the jury instructed on the lesser included crime of manslaughter.
"`While voluntary intoxication is never a defense to a criminal charge, it may negate the specific intent essential to a malicious killing and reduce it to manslaughter. § 13A-3-2, Code of Alabama (1975) (Commentary). "`When the crime charged involves a specific intent, such as murder, and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter.' Gray v. State, 482 So.2d 1318, 1319 (Ala.Cr. App.1985)." McNeill v. State, 496 So.2d 108, 109 (Ala.Cr.App.1986).'
"551 So.2d at 426. However, to negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity."
Smith v. State, 756 So.2d 892, 906 (Ala. Crim.App.1997) (on return to remand). This Court, likewise, has held that the intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity. Ex parte Bankhead, 585 So.2d 112, 120-21 (Ala.1991). See, also, Crosslin v. State, 446 So.2d 675 (Ala. Crim.App.1983).
McWhorter argues that his case is similar to Ashley v. State, 651 So.2d 1096 (Ala.Crim.App.1994). In Ashley, the Court of Criminal Appeals reversed a capital-murder conviction because the trial court had erred in refusing to give a manslaughter instruction after a witness testified that the defendant was intoxicated at the time of the crime. Ashley's ex-girlfriend testified that she had seen him at a bar approximately two hours before the stabbing and that he "looked like he was out of it" and "looked like he was on drugs." 651 So.2d at 1098. Another witness testified that Ashley looked "high" on the evening of the stabbing. Id.
This case is distinguishable from Ashley. McWhorter did not produce testimony regarding his alleged intoxication. In fact, his voluntary unsworn statement was the only evidence presented at trial regarding his intoxication. Although the trial court informed the jury that it could not convict McWhorter of capital murder if it found no specific intent, the evidence showed that the crime was carefully planned and carried out.
The Court of Criminal Appeals correctly compared this case to Hutcherson v. State. The court stated:
"In Hutcherson v. State, 677 So.2d 1174, 1175 (Ala.Cr.App.1994), the appellant had argued that the trial court erred in failing to instruct the jury on manslaughter where the trial court had given the jury an instruction on intoxication. The appellant in Hutcherson also cited Fletcher v. State, [621 So.2d 1010 (Ala.Crim.App.1993)], in support of his argument. However, in Hutcherson, this Court held that it was not plain error for the trial court to fail to give a manslaughter charge when it had given a charge on intoxication. One of the reasons given for this determination was based on the evidence at trial-there had been no indication that the appellant was so intoxicated that he could not form the necessary intent, despite his statement that he had ingested drugs and alcohol before the murder. This Court stated:
"`[T]he evidence of the appellant's intoxication was the appellant's statement *342 that he had taken five Valiums and had drunk alcohol before the murder. There is absolutely no evidence in the record that shows when prior to the murder these intoxicants were ingested. Also, the appellant's mother, who picked the appellant up on Moffatt Road after the murder, when asked if the appellant appeared intoxicated, stated that he looked "real tired." The jury's finding that the appellant was not so intoxicated that he could not form the specific intent is supported by the evidence.
"`"In the present case, the record contains no evidence either that defendant consumed an inordinate quantity of drugs or alcohol, or that his behavior actually demonstrated diminished capacity. Accordingly, the court committed no error in failing to instruct the jury on lesser included offenses based on defendant's failure to form a specific intent to commit the underlying felony."
"`People v. Kaurish, 52 Cal.3d 648, 276 Cal.Rptr. 788, 813, 802 P.2d 278, 303 [(1990)], cert. denied, 502 U.S. 837, 112 S.Ct. 121, 116 L.Ed.2d 89 (1991).'

"Hutcherson, supra, at 1198."
781 So.2d at 267.
"`[A] defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position,'" Fletcher v. State, 621 So.2d 1010, 1019 (Ala.Crim. App.1993) (quoting Ex parte Oliver, 518 So.2d 705, 706 (Ala.1987)), regardless of how "weak ... or doubtful in credibility" the evidence concerning the offense. Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978).
A trial court should give a charge on voluntary intoxication "if `there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt on the element of intent.'" Windsor v. State, 683 So.2d 1027, 1037 (Ala. Crim.App.1994) (quoting Coon v. State, 494 So.2d 184, 187 (Ala.Crim.App.1986)). In Windsor, the Court of Criminal Appeals found that there was no evidence that the appellant was intoxicated and that, although there was evidence that he had been drinking alcohol on the day of the murder, there was no evidence as to the quantity of alcohol consumed that day by the time of the murder. 683 So.2d at 1037. The court found that "[t]here was no `reasonable theory' to support an instruction on intoxication because there was no evidence of intoxication." Id. The court held that the trial court did not err in not instructing the jury on intoxication and manslaughter, because there was no evidence indicating that the defendant was intoxicated when the crime occurred.
The evidence offered by McWhorter as to his alleged intoxication was glaringly inconsistent with his own statement giving detailed descriptions of the events occurring at the crime scene. No evidence substantiated his claim to have been intoxicated at the time of the killing, and, indeed, the other evidence as to his condition at the time of the crime was totally consistent with the proposition that he was sober. We hold that McWhorter's self-serving statements suggesting he was intoxicated at the time of the killing, statements made in his internally inconsistent interview by Detective Maze, is, as a matter of law, insufficient to satisfy the rigorous standard of showing that the intoxication relied upon to negate the specific intent required for a murder conviction amounted to insanity. As previously noted, that standard is that "the *343 intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity." Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991).
Although the trial court refused to charge the jury on lesser included offenses, it charged the jury on voluntary intoxication. The trial court stated:
"I charge you, members of the jury, that if you find from the evidence that the Defendant was voluntarily intoxicated to the extent he could not form the necessary specific intent to rob Edward Lee Williams then you cannot convict the Defendant of capital murder."
Because there was no substantial evidence indicating that at the time of the crime McWhorter was intoxicated to such a degree that the intoxication amounted to insanity, the trial court's voluntary-intoxication charge was neither prejudicial nor necessary.
The Court of Criminal Appeals held that no reasonable theory would have supported a charge on the offense of intentional murder or felony murder. It found that the evidence presented at trial indicated either that McWhorter intentionally killed the victim in the course of a robbery or that he was not guilty. We hold that the trial court's failure to instruct the jury on felony murder and intentional murder was not error.

V. Proportionality of Sentences

McWhorter argues that his sentence is not proportionate to the sentences imposed on the others involved in the crime. He argues that, because he was 18 years old at the time of the crime and had no prior arrests and because none of the other persons involved in the crime received the death penalty, his death sentence was not proportionate to the sentences imposed on the others. McWhorter argues that there is no explanation for the apparent disparity in sentencing and that the imposition of his sentence violates his rights to due process, to a fair trial, and to a proportionate sentence, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Because McWhorter did not in the trial object to the sentence on the basis that it was disproportionate, this Court has reviewed this issue by the plain-error standard.
We recently addressed proportionality of sentences in Ex parte Burgess, [Ms. 1980810, July 21, 2000] ___ So.2d ___ (Ala.2000) (opinion on application for rehearing). In that case, the defendant Burgess, Demetrius Stevenson, and Richie Jones were all in Kevin Gardner's automobile at the time of the robbery-murder. Both Stevenson and Jones admitted that they had participated with Burgess in the discussion regarding the plan to steal a car or a car stereo, and they admitted that they were in the car when Gardner was killed. Stevenson, Jones, and three other men all drove to Birmingham with Burgess to attempt to sell Gardner's stolen car. Burgess was the only one charged in the capital crime. The two men who were with Burgess when Gardner was killed and the three men who joined the others in attempting to sell the automobile all received immunity from prosecution. At Burgess's trial, the court overrode the jury's recommendation of life imprisonment without parole and sentenced him to death. In reversing Burgess's death sentence, we held that the trial court should have given greater weight than it did to the fact that all other participants in the crime received complete immunity from prosecution.
McWhorter's case is distinguishable from Burgess. After McWhorter was convicted and sentenced, Daniel Minor and Lee Williams, who at the time of the crime *344 had been 16 years old and 15 years old, respectively, each pleaded guilty to murder and received a sentence of life imprisonment. Minor participated in the killing, while Williams, the victim's son, participated in planning the killing. While Marcus Carter was not charged, he was not involved in planning the crime and was not involved in the actual killing.
The law does not require that each person involved in a crime receive the same sentence. Wright v. State, 494 So.2d 726, 739 (Ala.Crim.App.1985) (quoting Williams v. Illinois, 399 U.S. 235, 243, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970)). Appellate courts should "examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any." Beck v. State, 396 So.2d 645, 664 (Ala. 1980). However, the sentences received by codefendants are not controlling per se, Hamm v. State, 564 So.2d 453, 464 (Ala. Crim.App.1989), and this Court has not required or directed that every person implicated in a crime receive the same punishment. Williams v. State, 461 So.2d 834, 849 (Ala.Crim.App.1983), rev'd on other grounds, 461 So.2d 852 (Ala.1984). "`There is not a simplistic rule that a codefendant may not be sentenced to death when another co-defendant receives a lesser sentence.'" Id. (quoting Collins v. State, 243 Ga. 291, 253 S.E.2d 729 (1979)).
The trial court considered McWhorter's age and lack of criminal history as mitigating circumstances. However, McWhorter's pivotal role as the "triggerman" in the crime distinguishes his involvement in the capital offense from the involvement of Minor and Williams. McWhorter told Abraham Barnes that he unloaded a clip on the victim when Minor was unable to kill the victim. Despite McWhorter's age, the lesser sentences imposed on Minor and Williams, and the fact that Carter was not prosecuted, we conclude that McWhorter's sentence was not disproportionate.

VI. Conclusion

We have carefully reviewed all the issues presented in McWhorter's petition, in the parties' briefs, and at oral argument. We find no error, in either the guilt phase or the penalty phase of McWhorter's trial, that would warrant a reversal of his conviction or his sentence. We therefore affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
HOOPER, C.J., and MADDOX, HOUSTON, BROWN, and ENGLAND, JJ., concur.
COOK and JOHNSTONE, JJ., concur in part and concur in the result in part.
SEE, J., concurs in the result.
COOK, Justice (concurring in part and concurring in the result in part).
I concur in the main opinion in part and join Justice Johnstone in his discussion of issues XXVI and XXVII.
JOHNSTONE, Justice (concurring in part and concurring in the result in part).
I concur in the main opinion in all respects except its statement that the Court of Criminal Appeals correctly resolved all 29 issues. While I concur in the result of the resolution of issues by the Court of Criminal Appeals, I write to express some reservations about its rationale on some of the issues.
Discussing issue number XXVI, the Court of Criminal Appeals, 781 So.2d at 324, quotes with approval language from the decision of Jenkins v. State, 627 So.2d 1034, 1045 (Ala.Crim.App.1992), aff'd, 627 *345 So.2d 1054 (Ala.1993), as follows: "Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence." This Court recently disapproved similar language. Ex parte Samra, 771 So.2d 1122, 1122 n. 1 (Ala.2000). At trial, this not-then-yet-convicted defendant objected to certain gruesome photographs on the ground that they were unduly prejudicial. The purpose of such an objection is to avoid an unfair conviction resulting from undue prejudice. In analyzing this objection by quoting the language from Jenkins v. State, the Court of Criminal Appeals commits the fallacy of begging the question that is, assuming the very proposition to be provedby branding the objecting defendant as the perpetrator of the crime at a time in the trial preceding his conviction in order to justify the admission of the photographs to prove his guilt.
Issue number XXVII in the opinion by the Court of Criminal Appeals is the defendant's contention that "the capital sentencing statute in Alabama is unconstitutional because it does not specify the weight the judge should give the jury recommendation in [the judge's] consideration of a sentence." 781 So.2d at 324. The defendant challenges the statute not only on the ground of the Eighth Amendment to the United States Constitution, but also on the ground of the Fourteenth Amendment to the United States Constitution, which guarantees both due process of law and equal protection of the laws. The Court of Criminal Appeals states that "this issue has been addressed and rejected by the appellate courts of Alabama, based on the United States Supreme Court's decision in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995)." 781 So.2d at 324. While Harris does hold that Alabama's capital sentencing statute does not violate the Eighth Amendment, Harris does not hold that the statute does not violate the Equal Protection Clause or the Due Process Clause. Indeed, after describing the disparate weights ascribed by different Alabama circuit court judges to jury recommendations of the death penalty, the Harris Court expressly observes that Harris did not challenge the statute on equal protection grounds. Harris, 513 U.S. at 514, 115 S.Ct. 1031. While Justice Stevens's dissent in Harris contends that the Alabama statute violates both the Eighth Amendment and the Due Process Clause, the majority does not mention any due process issue at all.
The absence of any specification of the weight to be ascribed to a jury recommendation of the penalty in a capital case and the consequent disparate weights ascribed by different Alabama circuit judges to jury recommendations may well violate the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. Presently in Alabama, however, this issue would seem critical only in the case of a trial judge's imposing a sentence different from that recommended by the jury because the Alabama statute does not require the judge to accord any degree of deference to the jury recommendation. A defendant could hardly contend that Alabama's statute requires too much deference, as it requires none. In the case before us, the jury recommended death and the trial judge imposed death. The defendant does not argue, and no aspect of the sentencing order suggests, that the trial judge was unduly constrained by the jury recommendation.
Finally, I do not necessarily agree with the rationale of the Court of Criminal Appeals in its discussion of issue number II of its opinion regarding the trial judge's excusal of a veniremember or in its discussion of issue number IX regarding the *346 failure of the trial judge to charge the jury on its duty to assess the voluntariness of the defendant's statement and on the alternative ramifications of such an assessment.
NOTES
[1] Because the petition in this case was filed before the effective date of the revised version of Rule 39, Ala.R.App.P., May 19, 2000, we have searched the record in this case for plain error.
[2] Under these circumstances, we conclude that, under the plain-error doctrine, the trial court's failure to give a voluntary-manslaughter instruction was not error. See Williams v. State, [Ms. CR-98-1734, Dec. 10, 1999] ___ So.2d ___ (Ala.Crim.App.1999).